**In the Best Interest and Protection of G.B.R., Appellant.**

**No. 08–96–00227–CV.**

Court of Appeals of Texas, El Paso.

July 31, 1997.

---

# 393

Michael Holmes, Odessa, for Appellant.

John W. Smith, District Attorney, Odessa, for Appellee.

Before BARAJAS, C.J., and McCLURE and CHEW, JJ.

### *OPINION*

McCLURE, Justice.

This is an appeal from an order extending the commitment of Appellant to a state hospital for a period of twelve months. We conclude that a unanimous verdict is not required in mental commitment proceedings, and that sufficient evidence supports the jury findings. Accordingly, we affirm the judgment of the trial court.

## PROCEDURAL HISTORY

In 1990, Appellant was indicted for the murder of Wayman Dale Adair by striking him on the head with a hatchet and shooting him with a firearm. He was found not guilty by reason of insanity. Because the trial court found that Appellant had committed an act of serious bodily injury to another person, it retained jurisdiction over him for purposes of commitment pursuant to Article 46.03 of the Code of Criminal Procedure. On December 20, 1990, the court entered its order for automatic commitment for evaluation, and on March 1, 1991, March 2, 1993, and March 3, 1994, it entered further orders for extended commitment.

In February of 1996, yet another extended commitment hearing was conducted and Appellant demanded a jury. The jury determined:

- that Appellant is a mentally ill person;
- that he is likely to cause serious harm to himself;

● that he is likely to cause serious harm to others;

● that if not treated, he will continue to suffer severe and abnormal mental, emotional or physical distress; will continue to experience deterioration of his ability to function independently; is unable to make a rational and informed decision as to whether or not to submit to treatment; and

● that his condition is expected to continue for more than ninety days.

The trial court's Order Extending Commitment recited verbatim the jury's verdict. Now comes this appeal.

## UNANIMOUS VERDICT NOT REQUIRED

The record before us reflects that with the exception of Special Issue Number Three, the jury answered "Yes" to all questions submitted. With regard to the third special issue, the jury responded:

**SPECIAL ISSUE NO. 3.** Do you find by clear and convincing evidence that [G.B.R.] is likely to cause serious harm to others? Answer "Yes" or "No": ANSWER: 10—Yes 2—No

In Point of Error No. One, Appellant argues that a proceeding for extended commitment is a quasi-criminal matter such that a unanimous verdict should be required.[1] We are not convinced that the verdict is not unanimous. An order for extended mental health services is governed by TEX. HEALTH & SAFETY CODE ANN. § 574.035 (Vernon 1992). Pertinent to our analysis are Sections (a), (b) and (c):

(a) The jury, or the judge if the right to a jury is waived, may determine that a proposed patient requires court-ordered extended mental health services only if the jury or judge finds, from clear and convincing evidence, that:

(1) the proposed patient is mentally ill;

(2) as a result of that mental illness the proposed patient:

(A) is likely to cause serious harm to himself;

(B) is likely to cause serious harm to others; **or**

(C) will, if not treated, continue to suffer severe and abnormal mental, emotional, or physical distress, will continue to experience deterioration of his ability to function independently, and is unable to make a rational and informed decision as to whether or not to submit to treatment;

(3) the proposed patient's condition is expected to continue for more than 90 days; **and**

(4) the proposed patient has received court-ordered inpatient mental health services under this subtitle or under Section 5, Article 46.02, Code of Criminal Procedure, for at least 60 consecutive days during the preceding 12 months.

(b) The jury or judge must specify which criterion listed in Subsection (a)(2) forms the basis of the decision.

(c) The jury or judge is not required to make the finding under Subsection (a)(4) if the proposed patient has already been subject to an order for extended mental health services.

The special issues submitted to the jury track the legislative requirements. Special Issue Nos. Two, Three, and Four inquired as to the criteria for the decision in keeping with subsection (a)(2). Our review of the current statute and its predecessor convinces us that these are alternative bases for extended mental commitment. Subsection (a)(2) is drafted in the disjunctive. The fact finder must find from clear and convincing evidence that the proposed patient is either likely to cause serious harm to himself, to others, **or** will, if not treated, continue to suffer severe and abnormal distress, a con-

---

1. Appellant's argument consists of a series of statements unsupported by citation to any authority. Failure to cite authority in support of a point of error on appeal waives the complaint. *Romero v. Parkhill, Smith & Cooper, Inc.,* 881 S.W.2d 522, 529 (Tex.App.—El Paso 1994, writ denied) *Luker v. Arnold,* 843 S.W.2d 108, 120 (Tex.App.—Fort Worth 1992, no writ); *Malouf v. Dallas Athletic Country Club,* 837 S.W.2d 674, 678 (Tex.App.—Dallas 1992, writ dism'd w.o.j.); TEX R.APP P. 74(f). Nevertheless, we will address Appellant's contentions in the interest of justice.

tinued deterioration of his ability to function independently, and an inability to decide whether to seek treatment. Any one of these findings, coupled with a finding that the proposed patient is mentally ill **and** that the condition is expected to continue for more than ninety days, will justify an extended commitment. Here, it is certainly plausible, based on our perception of the jury's methodology in answering the special issues that they found unanimously that Appellant is likely to cause serious harm to himself and that he will, if not treated, continue to suffer severe and abnormal distress and continued deterioration, and will be unable to decide whether to seek further treatment. Either finding supports the verdict and the commitment order.

The predecessor to Section 574.035 was TEX.REV.CIV.STAT.ANN. art. 5547–1 *et seq.* Section 50(b)(2) contains virtually identical language to TEX.HEALTH & SAFETY CODE ANN. § 574.035(a)(2)(Vernon 1992). In *Johnson v. State*, 693 S.W.2d 559 (Tex.App.—San Antonio 1985, no writ), the court was faced with jury findings that Johnson was likely to cause serious harm to herself but that she was not likely to cause serious harm to others. The court concluded that the Mental Health Code provides three alternative means by which an impaired person may be involuntarily committed. 693 S.W.2d at 562. We agree. Thus, it appears to us that with regard to two of the three alternative bases for commitment, the jury verdict was unanimous.

However, because we cannot be certain that the methodology employed by the jury below was consistent with regard to all five special issues, we address Appellant's general argument that a unanimous verdict is or should be required in civil commitment proceedings. We disagree with his contention. The Texas Mental Health Code is contained within the civil statutes, and mental health commitment proceedings are considered to be civil rather than criminal in nature. *Taylor v. State*, 671 S.W.2d 535, 539 (Tex.App.—Houston [1st Dist.] 1983, no writ). This being a civil matter, the Texas Rules of Civil Procedure control the procedural aspects of the case. Rule 292 allows the rendering of a verdict by ten members of an original jury of twelve or by five members of an original jury of six. Tex.R.Civ.P. 292.

The specific application of Rule 292 to commitment proceedings was addressed by the Court in *Taylor*. Taylor had contended that notwithstanding Rule 292, Texas requires a unanimous verdict in criminal cases, and since mental health proceedings involve involuntary commitment, a unanimous verdict should be required there as well. The Court rejected this argument and concluded that the due process clause of the federal constitution does not require a unanimous verdict in criminal cases. 671 S.W.2d at 539, *citing Apodaca v. Oregon*, 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972). Related arguments were urged by the appellant in *N.W. v. State*, 678 S.W.2d 158, 160 (Tex. App.—Beaumont 1984, no writ), who contended that a commitment proceeding is criminal in nature because it involves coerced restraint. The Court disagreed, holding that "[t]his proceeding is not to be treated as a criminal case with all the procedural requirements of a criminal hearing strictly applicable." 678 S.W.2d at 160; *citing Jones v. State*, 610 S.W.2d 535 (Tex.Civ.App.—Houston [1st Dist] 1980, ref'd n.r.e.). *See also Addington v. Texas*, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979). We conclude that a proceeding for extended commitment to a mental hospital is a civil matter, notwithstanding the underlying criminal prosecution. Appellant's first point of error is overruled.

### FACTUAL SUFFICIENCY

Appellant's second point of error challenges the sufficiency of the evidence to support the jury findings upon which the trial court's extended commitment order was based. Because he has briefed only the "insufficient evidence" complaint, our review is restricted to factual sufficiency.

### Burden of Proof: Clear and Convincing Evidence

The Texas Health and Safety Code does not authorize a judge or jury to determine that a proposed patient requires court-ordered mental health services unless the court or jury finds by clear and convinc-

ing evidence that the statutory requirements for commitment have been met. To meet this clear and convincing evidence standard, the evidence must include expert testimony and, unless waived, evidence of a recent overt act or a continuing pattern of behavior that tends to confirm the likelihood of serious harm to the patient or to others, or a continuation of the patient's severe distress and deterioration of ability to function, and the inability to make a decision about continuing treatment. TEX.HEALTH & SAFETY CODE ANN. § 574.034(c). Long before the Legislature enacted the present Code, the Texas Supreme Court adopted the "clear and convincing evidence" standard of proof to govern proceedings brought for the purpose of committing a person to a state mental hospital for an indefinite period, defining that standard as the measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. *State v. Addington,* 588 S.W.2d 569, 570 (Tex. 1979). The clear and convincing evidence standard is somewhere between the preponderance standard of civil cases and the reasonable doubt standard of criminal cases. *Id.* While the proof must weigh heavier than merely the greater weight of the credible evidence, there is no requirement that the evidence be unequivocal or undisputed. *Id.*

### Appellate Standard of Review: Stricter Scrutiny Required

 Because this case involves an elevated standard of proof in the trial court, we must initially address whether we apply a heightened standard of review in this Court. We have recently determined that because the traditional factual sufficiency review is inapplicable to an enhanced burden of proof, a stricter scrutiny is required. *In the Interest of B.R.,* 950 S.W.2d 113 (Tex.App.—El Paso 1997, no writ). Indeed, we found it incongruous to require the trial court to apply an enhanced burden of proof when decid-

ing the issues while requiring the appellate court to apply the standard of review accorded to issues decided by a preponderance of the evidence. Where the burden of proof at trial is by clear and convincing evidence, we will apply the higher standard of factual sufficiency review first articulated in *Neiswander v. Bailey,* 645 S.W.2d 835, 835–36 (Tex. App.—Dallas 1982, no writ). After considering all of the evidence, we must determine not whether the trier of fact could reasonably conclude that the existence of a fact is more probable than not, as in ordinary civil cases, but whether the trier of fact could reasonably conclude that the existence of the fact is highly probable.[2] Under this standard, we must consider whether the evidence was sufficient to produce in the mind of the fact finder a firm belief or conviction as to the truth of the allegations sought to be established. *Mezick v. State,* 920 S.W.2d 427, 430 (Tex.App.—Houston [1st Dist.] 1996); *In the Interest of P.S. and L.S.,* 766 S.W.2d 833, 835 (Tex.App.—Houston [1st Dist.] 1989, no writ). We will sustain an insufficient evidence point of error only "if the fact finder could not have reasonably found the fact was established by clear and convincing evidence." *Mezick,* 920 S.W.2d at 430, *quoting Williams v. Texas Dept. of Human Services,* 788 S.W.2d 922, 926 (Tex.App.—Houston [1st Dist.] 1990).

### Evidence Presented is Factually Sufficient

 The evidence presented meets this "clear and convincing" standard. Appellant is the son of the founder of the Branch Davidians Association.[3] Appellant spent his early years in Odessa, living there from 1940 until 1958 and from 1961 until 1965. He testified that the organization was founded to rebuild the temple in Jerusalem; indeed between 1958 and 1961, Appellant lived in the state of Israel, building a vegetation village in Northern Galilee. He also built a house there during this same period of time.

---

2. As noted by the Fort Worth Court of Appeals in its decision originally adopting the higher standard of review, the phrase "highly probable" is merely a synonym for "clear and convincing." *In the Interest of L.R.M. and J.J.M.,* 763 S.W.2d at 66; *Neiswander,* 645 S.W.2d at 835–36.

3. Appellant testified that the organization developed from the Seventh Day Adventist Church in Los Angeles in 1930. In 1935, the group moved to Waco, Texas. In later testimony, Appellant claimed that his father became the "new" president when the "founder" died in 1955.

In 1965, Appellant moved to the Branch Davidians' Mount Carmel property near Waco. After his father's death in 1979, Appellant assumed the presidency of the Branch Davidians. His role was challenged by the executive counsel and following a jury trial in a civil court in Waco, Appellant was removed from office. Thereafter, his mother became the president of the organization.

Appellant testified that he met David Koresh at some point between 1981 and 1983 when Koresh came into the organization. In 1983, Koresh burned down the organization's publishing house.[4] In 1984, Appellant was told by his mother that Koresh had raped her and that she entered into a common-law marriage with him to avoid the stigma of the rape within the organization. His mother was 67; Koresh was 24. Appellant also testified that Koresh later told him that he and his sister had to die because their mother had told them that Koresh had raped her. On November 3, 1987, a gun battle ensued during which Koresh and seven others, armed with automatic weapons, shot and wounded Appellant.

In June of 1989, Appellant moved back to Odessa. He came to know the murder victim, Dale Adair, who had become part of the Branch Davidian group in Odessa in the 1950's.[5] Appellant testified that Adair joined the Nazi party in 1971 and had written a book about Nazism, all of which was contrary to the beliefs of the Branch Davidians. Appellant also claimed that Koresh had Nazi affiliations and was called "Little Hitler". Appellant believed that the Nazis were "out to get" him through Koresh and Adair and that Adair "had a debt to carry out to kill me." Appellant admitted to using an ax to knock out Adair and then used Adair's gun to shoot him. Following his murder trial, Appellant was committed first to Vernon State Hospital in Vernon, Texas, and later moved to Big Spring State Hospital. In the fall of 1993, he left the hospital without permission, boarded a bus for Abilene, and sought medical attention for a perceived medical problem. He was arrested in Abilene and returned first to Big Spring and then to Vernon State Hospital. Appellant was transferred back to Big Spring in March of 1995. Again in September of that year, he left the hospital without permission. He testified that he had a mission to perform, and that he had traveled to the Israeli consulate in New York City to get their assistance with transportation back to Jerusalem so he could speak with members of the Knesset whom he knew. His mission concerned the peace process between Israel and the PLO. According to Appellant, the peace process was not successful because they were leaving out of the negotiations the Saudi Arabians, who fund the PLO to wage war on Israel.

When he arrived at the Israeli consulate in New York, the officials were "stalling" on deciding whether they would provide him with a ticket to Jerusalem. Appellant testified that under Jewish law, "if a Jew is in trouble in another country that they provide him transportation home." Appellant claimed that he was a Jew, that his home was Jerusalem, and that he still had a house in Northern Galilee. In response to the stalling technique, Appellant staged what he called a "sit-in". When he refused to leave the consulate premises, the police were called and Appellant was taken to Bellevue Hospital in New York City. Appellant testified that had he been able to get to Israel, Yitzhak Rabin would not have been assassinated.

Dr. Gabriel Durand–Hollis, a psychiatrist at Big Spring State Hospital, was familiar with Appellant and his particular mental illness due to observations and treatments at the hospital. Dr. Durand–Hollis had reviewed Appellant's medical records from Bellevue Hospital and his diagnosis and prognosis by Dr. Ernesto Fernandez, another psychiatrist at Big Spring State Hospital. Dr. Durand–Hollis testified that Appellant has never accepted his diagnosis and does not believe himself to be mentally ill. Instead, he believes that he is taking an anti-

---

4. According to Appellant, the Branch Davidian organization is a mail-order church or synagogue. Because the membership is scattered all over the world, the publishing house is the main outreach to the membership.

5. Dr. Durand–Hollis testified that the two were roommates.

psychotic medication because he suffers from abdominal epilepsy. Dr. Durand–Hollis also testified that he believed Appellant would stop taking his medication if he is released.[6] As an example, he told the jury that when Appellant left the hospital for New York in September 1995, he went without his medication and, within four days, he reacted to the Israeli embassy's refusal to provide him with a passport and airplane ticket by throwing himself on the floor and refusing to leave. As a result of this incident, he was admitted to Bellevue Hospital as a psychiatric in-patient, where the staff determined that he was suffering from a mental illness and required detention in the hospital for the purpose of continuing his treatment.

The doctor also testified concerning Appellant's mental state. With regard to the murder of Adair, Dr. Durand–Hollis testified that "he did that because he was responding to a higher calling that he believes he has. He has been given, not out of man but out of a higher power, he has been given an identity and a mission. His identity is he is the Messiah; the mission, to rebuild the temple in Jerusalem." According to the doctor, Appellant's description of his identity and his mission are delusional symptoms which will collide with society and the legal system.

On cross-examination, Dr. Durand–Hollis admitted that he and Dr. Fernandez had disagreed over Appellant's anticipated future behavior. Dr. Fernandez, in his Physician's Certificate of Mental Examination for Mental Illness, had stated that Appellant was likely to cause serious harm to himself and would, if not treated, continue to suffer severe and abnormal distress, would continue to experience deterioration of his ability to function independently, and would be unable to decide whether to submit to treatment. In his certificate, Dr. Durand–Hollis had stated only

the latter.[7] Dr. Durand–Hollis was also challenged on cross-examination that Dr. Fernandez had diagnosed Appellant as paranoid schizophrenic, while he had issued a diagnosis of bipolar disorder. Dr. Durand–Hollis explained that the differing terms are not a contradiction, but part of the same process. He concluded by providing the necessary expert testimony establishing the statutory requirements:

● Appellant is mentally ill;

● that if not ordered to continue further hospitalization, he is likely to cause serious harm to himself or to others;

● that he will continue to suffer severe and abnormal mental, emotional or physical distress; that he will continue to experience deterioration of his ability to function independently; and that he will be unable to make a rational and informed decision as to whether or not to submit to necessary treatment; and

● that Appellant's mental illness is expected to continue for more than ninety days.

The evidence presented by Dr. Durand–Hollis was sufficient to allow the jury to conclude by clear and convincing evidence that Appellant's term at Big Spring State Hospital should be extended. *See Lopez v. State*, 775 S.W.2d 857, 860 (Tex.App.—San Antonio 1989, no writ); *Dial v. State*, 658 S.W.2d 823, 827 (Tex.App.—Austin 1983, no writ). Further, the unauthorized departure from the hospital in 1995 and the incident at the Israeli consulate in New York City establish the statutory requirement in TEX. HEALTH & SAFETY CODE ANN. § 574.034(c) of a recent overt act or a continuing pattern of behavior that tends to confirm the likelihood of serious harm to the proposed patient or others or the proposed patient's distress and the deterioration of ability to function. Ac-

---

6. Appellant admitted to having "a pretty severe case of depression" while he was in New York. When he was returned to the hospital, he began taking medication for depression, although he believed he is not dangerous when he is depressed. He plans to continue taking the medication "so I don't have the problem of depression." He also justified his decision to leave the hospital and head for New York based on the fact that the staff was trying to administer Clozaril to him, a medication which he believes is deadly to

Jews. According to Dr. Durand–Hollis, Clozaril is an antipsychotic drug.

7. We pause to note that although neither doctor stated in his written certificate that Appellant was likely to cause serious harm to himself, Dr. Fernandez stated that Appellant was likely to cause serious harm to others, and both doctors found that he would meet the third statutory criteria. We reiterate that the statute provides alternative grounds for commitment.

cordingly, Appellant's second point of error is overruled.

We affirm the judgment of the trial court.