Mark Matthew JOHNSTONE, Appellant,

v.

The STATE of Texas, Appellee.

Nos. 01–98–00525–CV, 01–98–01061–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

April 1, 1999.

Scott K. Boates, Houston, for appellant in No. 01-98-00525-CV.

Lisa S. Rice, Michael P. Fleming, Melinda Brents, Michael R. Hull, Houston, for appellee in No. 01-98-00525-CV.

Sherea McKenzie, Houston, for appellant in No. 01-98-01061-CV.

Melinda Brents, Houston, Lisa S. Rice, Houston, Michael R. Hull, Houston, for appellee in No. 01-98-01061-CV.

Panel consists of Justices COHEN, HEDGES, and NUCHIA.

## OPINION

HEDGES, J.

Appellant, Mark Matthew Johnstone, appeals two court-ordered commitments for temporary mental health services. As to both commitment orders, Johnstone contends that the evidence was legally and factually insufficient to support the jurys' findings. We affirm.

### Procedural Background

In March 1998, Johnstone's mother called the Pasadena Police Department and sought its assistance in having Johnstone committed for treatment. This was the sixth time that Johnstone's mother had begun the process for commitment of Johnstone, but the first time she had asked for police assistance. On April 13, 1998, a hearing for court-ordered mental health services was held at which the jury found that Johnstone was mentally ill and as a result of such mental illness was likely to cause serious harm to himself and would, if not treated, continue to suffer severe and abnormal mental, emotional, or physical distress, would continue to experience deterioration of his ability to function independently, and was unable to make a rational and informed decision as to whether or not to submit to treatment. Tex. Health & Safety Code Ann. § 574.034(a)(1)(2)(A),(C) (Vernon Supp.1999). On April 14, 1998, the trial court signed the judgment finding that Johnstone was in need of court-ordered mental health services, temporarily committing Johnstone to Rusk State Hospital for inpatient treatment for not more than 90 days.[1]

1. Appellate cause number 01–98–00525–CV, trial court cause number 79,146.

On July 30, 1998, the State submitted a sworn application for temporary mental health services. On August 6, 1998, a hearing for court-ordered mental health services was held at which the jury found that Johnstone was mentally ill and as a result of such mental illness would, if not treated, continue to suffer severe and abnormal mental, emotional, or physical distress, would continue to experience deterioration of his ability to function independently, and was unable to make a rational and informed decision as to whether or not to submit to treatment. TEX. HEALTH & SAFETY CODE ANN. § 574.034(a)(1)(2)(C) (Vernon Supp.1999). On August 6, 1998, the trial court signed the judgment finding that Johnstone was in need of court-ordered mental health services, temporarily committing Johnstone to Rusk State Hospital for inpatient treatment for not more than 90 days.[2]

### Factual Sufficiency Waiver

■ Johnstone attacks the legal and factual sufficiency of both orders of commitment. The State contends that Johnstone has waived his factual sufficiency challenge. We agree.

In a jury trial, a motion for new trial complaining that the evidence was factually insufficient to support a jury finding is a prerequisite to raising that complaint on appeal. TEX.R.CIV.P. 324(b)(2). In cause 01–98–00525–CV, Johnstone filed a motion for JNOV and new trial, but he did not complain about the factual sufficiency of the evidence. No motion for new trial was filed in cause number 01–98–01061–CV.

Johnstone argues that a motion for new trial was not needed to preserve his complaint because mental health commitments are quasi-criminal proceedings, and a motion for new trial is not needed in criminal trials to preserve a complaint of factual insufficiency. See In re P. W., 801 S.W.2d 1, 2 (Tex. App.—Fort Worth 1990, writ denied) (because case involves incarceration as in criminal case, court considers factual sufficiency

point of error as in criminal case, without preservation of error).[3] Johnstone also relies on the holding in Moss v. State, 539 S.W.2d 936, 941 (Tex.Civ.App.—Dallas 1976, no writ) in which the court held it would be contradictory to hold that the trial court retains authority to act on a motion for new trial within the periods of time prescribed by TEX.R.CIV.P. 329b and that the disposition of such a motion is a prerequisite to appeal when a mental health proceeding is subject to an accelerated timetable for filing and perfecting an appeal. We disagree with these holdings.

■ Mental health commitment proceedings are considered civil proceedings, as opposed to criminal proceedings, and the Texas Mental Health Code is contained within the civil statutes. Taylor v. State, 671 S.W.2d 535, 539 (Tex.App.—Houston [1st Dist.] 1983, no writ). The Texas Rules of Civil Procedure control the procedural aspects of a mental health commitment case. Id. A mental health commitment proceeding is not treated as a criminal case with all the procedural requirements of a criminal hearing strictly applicable. N.W. v. State, 678 S.W.2d 158, 160 (Tex.App.—Beaumont 1984, no writ) (citing Jones v. State, 610 S.W.2d 535 (Tex.Civ.App.—Houston [1st Dist.] 1980, writ ref'd n.r.e.)).

For example, a jury verdict in a mental health commitment proceeding need not be unanimous. In re G.B.R., 953 S.W.2d 391, 395 (Tex.App.—El Paso 1997, no writ). A person subject to commitment does not have the unbridled right to assert the privilege against self-incrimination. Greene v. State, 537 S.W.2d 100, 103 (Tex.Civ.App.—Houston [1st Dist.] 1976, no writ). Before the merger of the rules of evidence, a mental health commitment proceeding was subject to the civil rules of evidence. TEX. HEALTH & SAFETY CODE ANN. § 574.031(e) (Vernon 1992).

We hold that Texas Rule of Civil Procedure 324 applies to mental health commitment proceedings.[4] Because Johnstone did

---

**2.** Appellate cause number 01–98–01061–CV, trial court cause number 80,903.

**3.** Johnstone also cites L.S. v. State, 867 S.W.2d 838, 841 n. 2 (Tex.App.—Austin 1993, no writ) in

which the Austin Court adopted the holding of In re P.W.

**4.** In a prior decision involving appellant, the State also argued that Johnstone waived his factual sufficiency complaint because no motion for

not file a motion for new trial complaining of the factual sufficiency of the evidence to support the jurys' findings in either hearing, he has waived those complaints. Thus, we need only address the legal sufficiency of the jurys' findings in both matters.

### Standard of Review

The judge or jury may determine that a proposed patient requires court-ordered temporary mental health services only if the judge or jury finds from clear and convincing evidence that:

(1) the proposed patient is mentally ill; and

(2) as a result of that mental illness the proposed patient:

(A) is likely to cause serious harm to himself;

(B) is likely to cause serious harm to others; or

(C) is:

(i) suffering severe and abnormal mental, emotional, or physical distress;

(ii) experiencing substantial mental or physical deterioration of the proposed patient's ability to function independently, which is exhibited by the proposed patient's inability, except for reasons of indigence, to provide for the proposed patient's basic needs, including food, clothing, health, or safety; and

(iii) unable to make a rational and informed decision as to whether or not to submit to treatment.

TEX. HEALTH & SAFETY CODE ANN. § 574.034(a) (Vernon Supp.1999). Upon finding that a person is mentally ill, a jury is required to determine only one of the three criteria included in section 574.034(a)(2). *Goldwait v. State*, 961 S.W.2d 432, 434 (Tex. App.—Houston [1st Dist.] 1997, no writ).

▉ To be clear and convincing under this section, the evidence must include expert testimony and, unless waived, evidence of a recent overt act or a continuing pattern of behavior that tends to confirm: (1) the likelihood of serious harm to the proposed patient or others or (2) the proposed patient's distress and the deterioration of the proposed patient's ability to function. TEX. HEALTH & SAFETY CODE ANN. § 574.034(d) (Vernon Supp.1999). The expert opinions and recommendations must be supported by a showing of the factual bases on which they are grounded. *Johnstone v. State*, 961 S.W.2d 385, 388 (Tex.App.—Houston [1st Dist.] 1997, no writ).

▉ In reviewing no evidence complaints in mental health commitments, we must review only the evidence favorable to the court's judgment to see if there is more than a scintilla. Id. We consider only the evidence and inferences tending to support the fact finding, and we disregard all contrary evidence and inferences. *Leitch v. Hornsby*, 935 S.W.2d 114, 118 (Tex.1996). The clear-and-convincing burden of proof does not change the standard of review on appeal. *In re J.N.R.*, 982 S.W.2d 137, 142 (Tex.App.—Houston [1st Dist.] 1998, no pet.).

### April 14 Judgment (cause number 79,146)

▉ Johnstone does not challenge the jury's finding that he is mentally ill. He first attacks the jury's finding that he is likely to cause serious harm to himself. Johnstone contends that there is no evidence to support this finding because the State failed to introduce evidence of a recent overt act or a continuing pattern of behavior that tends to confirm the likelihood of serious harm to him. We disagree.

The State introduced the following evidence. Johnstone refused to take his medication. On March 11, 1998, Mrs. Johnstone, Johnstone's mother, was approached by her physician to discuss recent actions of Johnstone. Johnstone had called the physician's office several days in a row and asked to speak with the physician. The receptionist told Johnstone that the physician was unavailable and could not speak with him. Johnstone then said he was coming over to the office because what he had to do would not take long. The receptionist perceived

---

new trial was filed. *Johnstone v. State*, 961 S.W.2d 385, 387–88. We held a motion for new trial was not necessary to preserve the complaint because the appeal arose from a nonjury trial. *Id.* (citing former TEX.R.APP.P. 52(d)).

**954**

Johnstone's comments as a threat, called the police, and completed an incident report.

On March 12, 1998, Johnstone had been without sleep for 36 hours. Johnstone was not taking his medication and stated he would never take his medication again. At about 7:00 p.m., Johnstone stepped out the back door and proceeded to urinate under the back porch light next to the neighbor's bedroom window. Johnstone would become distant at times and then demand one's complete attention. Leading up to the night she called the police, Johnstone had very little sleep and paced continually. At times as he paced he would "run over" members of the family.

On March 14, 1998, Johnstone ran into his brother, and a scuffle ensued. Mrs. Johnstone realized she could not wait until the next Monday to have Johnstone committed. Johnstone's behavior was sufficiently threatening that his mother sought assistance from the Pasadena Police to have Johnstone committed. This was the first time in six commitments that she felt the need for assistance. Mrs. Johnstone attempted to call the police from her house, but Johnstone took the telephone away from her and forced her to go to her room. Mrs. Johnstone made her way to a neighbor's house and called the police. When the police arrived, Mrs. Johnstone told the officers that Johnstone was acting differently than he had in the past. Mrs. Johnstone was afraid of her son and feared returning home.

Several officers testified. This testimony indicated that when the officers questioned him about his medication and possible mental health problems and treatment, Johnstone's attitude and demeanor "started to escalate." Johnstone talked about "military type things" and "weapons and guns." Johnstone appeared very nervous and twitched a lot. When the officers told Johnstone they were going to take him into custody, he jerked back and put his hands in his jacket. The officers found a large pocketknife in his pocket.

Johnstone accused the officers of committing unlawful sexual acts. He told the officers that he did not recognize their authority as peace officers. On the trip to Ben Taub Hospital, Johnstone told an officer that:

> The officers had used a mental health warrant one too many times. And the next result was a dead officer and a dead patient. Look at the name of the street next to the police station; Jeff Ginn Memorial. You'll pay for it one day.

Given Johnstone's statements and the officer's knowledge that a Pasadena Police Officer had previously been killed, the officer feared for himself and other officers. The officer issued a "hazardous responder's warning" and the police department classified Johnstone as a "hazardous responder." This classification meant that whenever the Pasadena Police Department received a call within an area close to Johnstone's residence, the officers would be given Johnstone's name, address, physical description, and a summary of threats, fights, or other situations involving the police.

At Ben Taub Hospital, Johnstone was evaluated by Dr. Daniel Garza. Dr. Garza noted that Johnstone was extremely ungroomed, had poor hygiene, and had "an extremely rank odor to him." Johnstone was uncooperative and agitated. Although Johnstone complained of an injured wrist, he refused to have the wrist X-rayed or examined.

While waiting for the commitment proceeding, Johnstone was confined at the Harris County Psychiatric Center. Johnstone was first examined by Dr. James Ferrero. Dr. Ferrero found that Johnstone was unable to care for himself and required almost constant supervision to be maintained in the daily activities of living. Johnstone threatened Dr. Ferrero and other Center staff.

While at the Center, his treating psychiatrist was Dr. Nora Davis. Dr. Davis examined Johnstone and reviewed the file notes written by Center staff. Dr. Davis testified that this information was the type a person in her position would rely upon in forming an opinion.

Dr. Davis found that Johnstone suffered from delusions. Johnstone diagnosed a green stick fracture of his wrist. Johnstone said it was obvious that he had a fracture and there was no need for an X-ray because his

skin obviously had marrow in it. Johnstone also believed that he could detect people because he was "able to see the infra-red [sic] spectrum frequencies and the ultraviolet frequencies. And that's how he recognizes people by looking and seeing their core temper [sic], as compared to the ambient temperature of the wall."

On April 9, 1998, when asked how he was doing, Johnstone replied:

> I would like to tell you about my dissertation. It's about skinner boxes [sic]. Charles Whitman's mother's tomb actually is in a "skinner box." I was the first to see that, believe it or not. About my congenital mind reading, my eyes are different. TSO diagnosed me as being able to detect infra red [sic] frequencies. That's how I recognize you by seeing the temperature radiant between you and the ambient light. My mom and dad were the first persons I ever was able to detect. Now, I recognize you by your revolution pattern. Each pattern is unique. You also need to know from studying DNA, I was told that I have big adrenal glands and other parts I can't describe.

Based on her observations, Dr. Davis testified that because of his mental illness, Johnstone seemed to lose his boundaries, become disorganized, and become loud and intrusive.

Center notes indicated that Johnstone told staff members that he was a light-weight boxer who could knock them down in a second. On March 21, 1998, Johnstone approached a female patient, started using racial slurs, and described his previous assaults on blacks.

It was Dr. Davis' opinion that Johnstone would have difficulty interacting with members of the general public outside a controlled environment. Dr. Davis believed that Johnstone's behavior could very well be misinterpreted and that a person confronted by Johnstone might actually try to harm him. These opinions were based on the actions of Johnstone while at the Center. Thus, Dr. Davis' opinions were supported by a showing of the factual bases on which they were grounded.

While he was at the Center, Johnstone telephoned his mother five to ten times a day. Johnstone continually talked about "military things" and his father's dying wish that he "protect the clan Johnstone militarily." Johnstone expressed his desire to destroy the mental health system. Mrs. Johnstone was concerned that this meant violence.

We have previously held that evidence was sufficient to show a person's likelihood to cause serious harm to himself based on that person's hostile and provocative behavior toward his family and third parties. *Taylor*, 671 S.W.2d at 538. We held that such actions could foreseeably result in someone's acting in a more violent manner toward the person in the future and could result in injury to the appellant and perhaps to others. *Id.* The evidence before us compels the same holding.

Reviewing only the evidence in support of the court's finding, we hold that the evidence is legally sufficient to support the jury's finding that appellant is mentally ill and as a result of that mental illness is likely to cause serious harm to himself. In light of this determination, we need not discuss the other findings of the jury. *Goldwait*, 961 S.W.2d at 434.

We affirm the April 14, 1998 judgment of the trial court.

### August 6 Judgment (cause number 80,903)

Johnstone challenges the jury's finding that: (1) he is mentally ill; (2) that he is suffering severe and abnormal mental, emotional, or physical distress, experiencing substantial mental or physical deterioration of his ability to function independently, exhibited by his inability, except for reasons of indigence, to provide for his basic needs, including food, clothing, health, or safety; and (3) that he is unable to make a rational and informed decision as to whether to submit to treatment. Johnstone contends there is no evidence to support these finding because he alleges that the State failed to introduce evidence of a recent overt act or a continuing pattern of behavior that tends to confirm the finding.

### 1. Jurisdiction

■ The State argues that we are without jurisdiction to hear this claim because Johnstone did not timely file his notice of appeal. The trial court signed the judgment on August 6, 1998. A notice of appeal from a mental health commitment proceeding must be filed not later than the 10th day after the date on which the order is signed. TEX. HEALTH & SAFETY CODE ANN. § 574.070(b) (Vernon 1992). Johnstone filed his notice of appeal on August 26, 1998 and his extension of time for filing his notice of appeal on August 31, 1998.

The State argues that the extension for notices of appeal provided for by Texas Rule of Appellate Procedure 26.3 (allowing an extension if a request is made within 15 days after the deadline for filing) does not apply because the legislature preempted the appellate rules and did not provide for an extension of time to file. We disagree.

Just as the rules of civil procedure apply to a mental health commitment proceeding, so do the rules of appellate procedure. The legislature's intent was to provide a speedy appeal for those faced with a commitment order. *See* TEX. HEALTH & SAFETY CODE ANN. § 574.070(e) (Vernon 1992). Allowing an appellant additional time to file his notice of appeal does not thwart the legislature's intent. Because Johnstone's notice of appeal met the requirements of Rule 26.3, we have jurisdiction to hear his appeal of the August 6, 1998 order of commitment.

### 2. Mental Illness

■ Johnstone first argues there is no evidence to support the jury's finding that he is mentally ill. The jury was given the statutory definition of mental illness, which is defined as an illness, disease, or condition which either "(A) substantially impairs the person's thought, perception of reality, emotional process, or judgment; or (B) grossly impairs behavior as manifested by recent disturbed behavior." TEX. HEALTH & SAFETY CODE ANN. § 571.003(14) (Vernon 1992).

Dr. Joel Steinberg, a psychiatrist licensed to practice medicine in the State of Texas, testified on behalf of the State. Dr. Steinberg reviewed Johnstone's medical records and consulted with a team of psychiatrists who had been treating Johnstone. Johnstone refused to allow Dr. Steinberg to perform a complete psychiatric evaluation. Dr. Steinberg was able to observe Johnstone's behavior and demeanor, Johnstone's medical records, and the notes of other health professionals. Based on this information, he concluded that Johnstone suffered from paranoid schizophrenia.

Dr. Steinberg explained that paranoid schizophrenia is a "severe disorder which renders people having difficulty in their everyday activities and may manifest emotional outbursts and hostility." Dr. Steinberg testified about the behaviors exhibited by Johnstone during his interviews that lead to his diagnosis of paranoid schizophrenia. Johnstone was hostile and uncooperative. Johnstone would trail off on tangents when talking. Reviewing Johnstone's records, Dr. Steinberg noted that Johnstone refused to bathe. Dr. Steinberg was also aware of Johnstone's behavior leading to the removal from his mother's home in March 1998.

This uncontroverted testimony, based on Dr. Steinberg's own observations, as well as information he received about Johnstone's prior behavior, is some evidence and meets the standard of clear-and-convincing evidence that appellant is mentally ill. *In re J.S.C.,* 812 S.W.2d 92, 94 (Tex.App.—San Antonio 1991, no writ). Reviewing only the evidence in support of the jury's finding, we determine that the evidence is legally sufficient to support the finding that appellant is mentally ill.

We overrule issue one.

### 3. Inability to Function Independently

Johnstone contends that there is no evidence of recent overt acts or a continuing pattern of behavior to show that he is suffering severe and abnormal mental, emotional, or physical distress; that he is experiencing substantial mental or physical deterioration of his ability to function independently, exhibited by his inability, except for reasons of indigence, to provide for his basic needs, including food, clothing, health, or safety; and that he is unable to make a rational and informed decision as to whether or not to submit to treatment. In addition to the testimony offered by Dr. Steinberg, the jury

also heard from Mrs. Johnstone, appellant's mother.

Mrs. Johnstone testified that when Johnstone stopped taking his medication, his health and demeanor deteriorated. Johnstone went 24 to 27 hours at a time without sleep, he stopped bathing, and he talked to himself. Johnstone continually paced about the house, and at times he paced while eating. He lost weight.

Mrs. Johnstone testified that before his sixth commitment, Johnstone did not sleep, paced continually, and was constantly agitated. Johnstone urinated off the back porch. He walked into his brother and started a scuffle. He kept his mother from using the telephone when she attempted to obtain assistance in having him committed. Mrs. Johnstone testified that she would not allow Johnstone to move back in with her because of the continual pattern of deterioration of his health and demeanor that occurred when he stopped taking his medication.

Mrs. Johnstone testified that Johnstone had never had to take care of the basic necessities of life. He had never paid a utility bill or held down a job. Early in 1998, Johnstone attempted to have his social security disability checks stopped. Those checks provided the only support for Johnstone. Johnstone wanted to have his mother jailed because she initiated the social security payments.

Johnstone also testified. He admitted that he tried to stop his social security payments. He testified that he did not believe in mental illness. He would only believe in mental illness if the State brought it into the court and showed it to him, like a tuberculosis organism. Because he did not believe in mental illness, he refused to take his medication. Despite the reports from various health care personnel and his mother's testimony to the contrary, Johnstone insisted that he bathed daily.

Johnstone was asked whether he resided with his mother before his last commitment. He responded, "I reside at 1114 Valerie, Pasadena, Texas. I mean the other people who live there may consider themselves to reside with me. I don't consider the question myself."

Dr. David Yasko also testified. Dr. Yasko is Johnstone's friend and minister. Dr. Yasko had been called as a witness by Johnstone at the April 1998 hearing, but this time he was called by the State. Dr. Yasko talked to Johnstone three days before the August hearing. Johnstone was mad at Dr. Yasko because he did not like Dr. Yasko's testimony at the prior hearing. At this hearing, Dr. Yasko testified that he had seen a deterioration in Johnstone. Dr. Yasko felt that Johnstone was more angry and outraged at pretty much everything than he was three years ago.

 Based on Dr. Steinberg's own observations, Mrs. Johnstone's testimony concerning the continuing deterioration of Johnstone's condition whenever he stopped his medication, Dr. Yasko's testimony, and Johnstone's own testimony that he refuses to recognize a diagnosis of mental illness, we find more than a scintilla of evidence to support the jury's finding that Johnstone was suffering severe and abnormal mental, emotional, or physical distress; that he was experiencing substantial mental or physical deterioration of his ability to function independently, exhibited by his inability, except for reasons of indigence, to provide for his basic needs, including food, clothing, health, or safety; and that he was unable to make a rational and informed decision as to whether or not to submit to treatment. Reviewing only the evidence in support of the jury's finding, we determine that the evidence is legally sufficient to support that finding.

We overrule issue two.

We affirm the August 6, 1998 judgment of the trial court.

### Conclusion

We affirm both judgments of commitment.