25 S.W.3d 38 (2000)
In the Interest of C.H., d.o.b. 12/14/96.
No. 08-98-00183-CV.
Court of Appeals of Texas, El Paso.
April 20, 2000.
*41 Thomas E. Stanton, John T. Garcia, El Paso, for Appellants.
Jose R. Rodriguez, County Atty., El Paso, for Appellee.
Before Panel No. 1 LARSEN, McCLURE, and CHEW, JJ.

OPINION
DAVID WELLINGTON CHEW, Justice.
This is an appeal from a judgment terminating the parent-child relationships between C.H., a minor child, and his biological parents, Susan Hylton and Robert Garris. In two points of error, Ms. Hylton and Mr. Garris challenge the jury findings as legally and factually insufficient.

I.

Facts of the Case
Because of the evidentiary challenges, providing a detailed account of the record before us is necessary. The witnesses at this jury trial were both parents, two probation officers, five Department of Protective and Regulatory Services case workers, a police officer, a Court Appointed Special Advocate ("CASA") volunteer, two officials of the Substance Abuse Felony Probation, and the maternal grandmother.
The mother, Susan Hylton, was for seven years, beginning at the age of seven, sexually abused by two family members. In 1992, then fifteen years old, she began abusing drugs and running away from home. She became involved in prostitution and theft. In November 1992, the Texas Department of Protective and Regulatory Services ("the Department") became involved with Ms. Hylton, at the initiative *42 of her mother, Judith Moore, and in November 1993, she was committed to the Texas Youth Commission in Brownwood, Texas. Four months later, she gave birth to a daughter. The Department in Bexar County, Texas immediately sought and obtained custody of the infant, and placed the mother and daughter together at the San Antonio Salvation Army Home for Girls. When Ms. Hylton completed the Salvation Army's program, she returned to foster care in El Paso. The Bexar County Department officials transferred Ms. Hylton's daughter's case to El Paso County so that mother and infant could be placed with the same foster care provider.
The record is mostly silent about events soon after their return to El Paso, but it appears that Ms. Hylton was released from custody on reaching her majority. It is evident that an antagonistic relationship developed between Ms. Hylton and the Department over her child's custody. Despite considerable efforts to address Ms. Hylton's continued substance abuse problems, the Department had, by the fall of 1995, abandoned all reunification efforts and begun involuntary termination proceedings.
In December 1995, then eighteen-year-old Ms. Hylton began living with Robert Garris, a thirty-six-year-old African-American. A ten-year Army veteran, who was honorably discharged some years earlier, Mr. Garris was married but estranged from his wife and their teenage son. He had then an extensive criminal record that included a term of imprisonment. His admitted livelihood since 1991 was drug dealing and he was himself an addict.
In March 1996, Ms. Hylton consented to her daughter's adoption and relinquished her parental rights; her mother and Mr. Garris witnessed her affidavit doing so. Mr. Garris testified at the trial that Ms. Hylton had told him that same month that she was pregnant. He claimed that he encouraged her to seek medical care and Ms. Hylton confirmed that she had done so. Both of them admitted at trial that they were using cocaine during this period. They were arrested together in a motel room and charged with possession of cocaine and heroin in May 1996.
Mr. Garris remained jailed until July 30, 1996, when he entered a plea of guilty and received deferred adjudication and community supervision. The record reflects that Ms. Hylton was released much sooner because, on Thursday, June 13, 1996, she went to see Ms. Diane Barajas, her former Child Protective Services caseworker. Ms. Barajas testified that Ms. Hylton said that she might be four or five months pregnant, that she had been using a lot of cocaine, that she had been arrested with Garris and he was still in jail, and that she had no place to live. Ms. Hylton asked Ms. Barajas for help getting into the Aliviane drug treatment center for her baby's sake. Ms. Barajas took Ms. Hylton to the Aliviane Center where Ms. Hylton admitted herself. Ms. Barajas testified that she called the center some days later and was told that Ms. Hylton had left. The record reflects that Ms. Hylton checked out on June 21, 1996, eight days after she had admitted herself.
After Mr. Garris was released from jail, he visited Ms. Hylton once at her mother's home in early August 1996. He was arrested on drug charges in August and November 1996 and after the latter arrest, his probation was revoked. He was sentenced to ten years' imprisonment and he was serving that sentence at the time of this trial.
Though never explained, Ms. Hylton was clearly back in jail in early to mid-August 1996, and she remained jailed until after C.H.'s birth. During these last five months of her pregnancy, she received regular prenatal care and her son was born at Thomason General Hospital on December 14, 1996. The hospital discharged and released the infant to his grandmother, Judith Moore, four days later. Ms. Hylton was then released on probation on December 24, 1996, and she *43 immediately joined C.H. at her mother's home.
The record contains varied allegations by the Department that C.H. suffered drug withdrawal symptoms at birth. As an example, the first Family Service Plan stated that C.H. was "affected at birth by drugs taken by the mother during pregnancy," and "[C.H.] has been diagnosed with sickle cell anemia, and may be developmentally delayed in the future or have learning problems due to the mother's drug use during her pregnancy." We find no evidence that the child tested positive for cocaine at birth, that he was born premature, or that he had any physical defect or developmental delays indicative of in utero ingestion of cocaine. In fact, all testimony and photographs, suggest that C.H. was a full term, normal, well-developed baby at birth.
Ms. Hylton and C.H. were still living with her mother in early February 1997, when Robin Zajac, Ms. Hylton's probation officer, visited the home. About a week later, however, Ms. Hylton and C.H. left Mrs. Moore's house and they moved into an apartment with Ms. Hylton's new boyfriend, Michael Russey. There are few details about Mr. Russey provided except that he had a criminal record for burglary and sexual assault and was on probation.
Mrs. Moore testified that she visited her daughter and grandson at their apartment once or twice a week and that she cared for C.H. Friday or Saturday nights so her daughter would have some time off. She stated that the apartment was clean and tidy when she visited and that her family had helped Ms. Hylton and Mr. Russey furnish it. She also told the jury that though she was keeping a close watch, she never saw any sign of drug use by her daughter. During this time, C.H. had received neonatal checkups and Ms. Hylton was receiving welfare benefits for herself and her baby.
At 4 a.m. Sunday, March 9, 1997, Mr. Russey flagged down a passing police car. He told the officers that he had been in a fight with his girlfriend and that drugs were being used in the apartment. The police officers and Mr. Russey went to the apartment. While one officer and Russey went to the front door, the other officer, Arturo Chavarria, went to the rear door. Officer Chavarria testified that he could see into the apartment through the rear door window and that when his partner knocked at the front door, an African-American male opened the door of the bedroom. The man came out wearing only unbuttoned pants. At the same time, Officer Chavarria saw Ms. Hylton in the same bedroom, on the side of the bed, undressed, putting on a gown. When Officer Chavarria joined his partner and Mr. Russey inside, all of the adults in the apartment had been gathered. The officer testified that besides Ms. Hylton and the man who came out of the bedroom, there were two other couples.
C.H. was found asleep in the bedroom in a playpen. The playpen was in the corner of the bedroom, a short distance from the foot of the bed, on the same side of the bed the officer had seen Ms. Hylton putting on her gown. At the head of and beside the bed, on the carpeted floor, the police found a spoon containing cocaine residue, matches, a plastic baggie, and empty balloons identified as associated with heroin use. In the same spot, there was a clutter of paper scraps, an empty pack of cigarettes, cups, and a paper fountain cup used as an ashtray. On the adjacent nightstand, there was an eyeglass lens with cocaine residues in the concavity of the lens. Elsewhere police found a suspicious spoon in the bathroom and a discarded plastic syringe on the linoleum tiled floor of a closet or storage space.
In the living room and bedroom, there were several mounds of clothing strewn on the floor and on an armchair. Boxes and luggage were stacked next to the armchair. In the apartment's core hallway, the walls beside the kitchen and bathroom and a closet door were spattered with frying *44 pan grease. Two panes of glass in the casement window of the living room were broken out. Witnesses described the apartment as, at worst, "filthy" and "a disaster," and at best, "messy" and "in disarray." The photographs of the apartment admitted into evidence, showed that at the very least, it was messy, cluttered, and unkept. In contrast, the playpen, where C.H. was sleeping, was filled with stuffed toys and appears clean and well kept. Photographs show C.H. dressed in pajamas, covered with a blanket, and a nursing bottle at his side.
Ms. Hylton admitted at trial that she and Russey had been smoking cocaine that night. She testified that she and Russey had a violent argument which was confined to the living room and kitchen. She testified that grease had been flung from a frying pan onto the walls and doors in the hallway during the fight and that Russey had physically assaulted her. She also claimed that her neighbor, Christine Martinez, and a man named C.C. had come over to the apartment to stop the fight, and that Russey had left the apartment, but returned and left three times over a four-hour span before returning the fourth time with the police.
Ms. Hylton testified that when the police arrived, she was "laying down" with a man she knew only as "C.C." She testified that the only adults in the apartment when the police arrived were herself, C.C., and maybe Ms. Martinez, and that Russey came in with the two police officers.
Ms. Hylton was the only person arrested and she was charged with possession of cocaine. The Department was notified and at 4:55 a.m., Emergency Worker David Abogado, received instructions to go to the apartment. When he arrived, Ms. Hylton was in custody and sitting in a police car. Mr. Abogado took custody of C.H. from a police officer who was then holding C.H. and left a notice of removal and his business card at the apartment. He took the child to the home of Mr. and Mrs. Sapien. C.H. has remained in their foster care since that morning.
Mr. Abogado testified that later that same day, he tried to visit Ms. Hylton at the jail but could not. He did not try to visit her on March 10, but next went to the jail on March 11. He was told to return in a few hours because there was a "shake down" in progress. When he returned the following day, March 12, 1996, Ms. Hylton had been released.
Elizabeth DeLuna, a Department Assessment Worker, testified that she went to Ms. Hylton's apartment on March 11 to give Ms. Hylton notice of a psycho-social evaluation scheduled for her with Richard Park, Ph.D., a marriage and family therapy counselor, on March 14, at 11 a.m. Ms. DeLuna stated that although she could hear noise coming from the apartment, no one came to the door. She left a "speed memo" with the appointment date and time and her business card on the door. She testified that she also told Mrs. Moore about the appointment. That same day, Ms. DeLuna also visited C.H. at the foster home, and she made two more visits, on March 13 and 24. She testified that C.H. "was being very well taken care of. He seemed like a very happy child. He responded to foster mother [sic] very well. Developmentally-wise, he was developing appropriately, as to my opinion. He was just a happy child."
Dr. Park testified that Ms. Hylton telephoned him at 11 a.m. on March 14 and told him that she "couldn't make it," so the evaluation was rescheduled for March 17. When Ms. Hylton failed to show up for that appointment, Dr. Park contacted Ms. Hylton's mother. It appears that Mrs. Moore met with Dr. Park, and, according to Dr. Park, they "did the psycho-social." His testimony suggests that he, in fact, recommended termination of Ms. Hylton's parental rights because he had no "basis for saying that either [Garris or Ms. Hylton] could be an appropriate parent at this time."
*45 The Department held its First Treatment Team Meeting on March 20, in preparation for a Show Cause Hearing scheduled for the following day. The recommendations made included: a home study on Judith Moore; continued foster care for C.H.; no visitation for Ms. Hylton until she completes psycho-social evaluation; and termination of parental rights of the mother and father.
David Abogado testified that he finally contacted Ms. Hylton on the morning of March 20 at her apartment. He asked her why she had not gotten in touch with him. She told him that she had been trying to get into Aliviane and that she had spoken to a Department caseworker. She denied receiving the Notice of Removal or his card that he left at the apartment on March 9. Mr. Abogado stated that Ms. Hylton appeared tired and lethargic, that there were people sleeping on the floor of the living room, and that the apartment was much in the same condition as it had been on March 9. Mr. Abogado informed Ms. Hylton that there was a Show Cause Hearing scheduled for the next day, March 21, 1997.
Mr. Garris, Ms. Hylton, and Mrs. Moore were present at the Show Cause Hearing. The findings issued by the trial court reflect that Officer Chavarria testified that Ms. Hylton was arrested for possession of cocaine, that the apartment was filthy, and known prostitutes and ex-convicts were present in the apartment. A case worker, presumably David Abogado, also testified at that hearing that C.H. was found with a soiled and wet diaper that appeared not to have been changed all night. The trial court noted the caseworker's allegation that "birth records state child had withdrawal symptoms at birth." Finally, there is a finding that Ms. Hylton admitted placing C.H. in danger by having him in the apartment while individuals were using drugs.
The trial court ordered Ms. Hylton to submit to random urinalysis tests and scheduled her for a psycho-social evaluation that same day. Ms. Hylton submitted to neither. At the next hearing, on March 27, 1997, Ms. Hylton and her mother were present and the trial court gave Ms. Hylton one more opportunity to submit to the evaluations. She was also ordered to submit to therapy sessions for "the purpose of discussing relinquishment." A follow-on Service Plan Meeting was scheduled for April 4, 1997.
On March 29, 1997, Ms. Hylton was arrested near Las Cruces, New Mexico; she was a passenger in a car loaded with marijuana. In a letter dated April 17, 1997, to caseworker Kelly Perea, Ms. Hylton explained that she caught a ride with a friend to visit her mother for Easter (March 30, 1997) and did not know that there was thirty-six pounds of marijuana in the car. In the letter, she also claimed that she had spoken with someone at the Department about C.H. after she got out of jail. The record is vague about the disposition of the criminal charges against Ms. Hylton. It does reflect that she remained jailed in New Mexico until September 1997, when she was transferred to the El Paso County Jail. Shortly thereafter, her December 1996 plea of guilty for possession of cocaine was adjudicated and she was placed in the Substance Abuse Felony Program ("SAFP") as a condition of probation. In November 1997, she was transferred to the nearest SAFP facility in Burnet, Texas.
There was testimony that she was enrolled in an intensive chemical dependency treatment program and had been evaluated to attend a victim of sexual abuse program. The SAFP program, according to several witnesses consists of a six-month to one-year commitment, usually nine-months, followed by a thirty to ninety-day period at a transitional treatment center. There was also testimony that it was a very challenging and successful program in helping attendees stay clean and sober. At the time of trial, Ms. Hylton was still committed to SAFP, but the trial had interrupted her program schedule. She testified *46 that she expected to complete SAFP in July 1998, and go to a halfway house in Dallas, Texas. Testimony was presented that there were no halfway houses in El Paso.
Ms. Hylton acknowledged her drug addiction but maintained that because of the SAFP programs, she believed that she could remain clean and knew the necessary steps to do so. She could not, however, promise that she would remain sober. She expressed her determination to give her son a stable and loving home.
Dr. Park testified that he conducted the psycho-social evaluation on Mr. Garris on March 25, 1997, more than a year before trial. The therapist testified that he visited with Garris in the jail for one and one-half hours and then recommended that Mr. Garris' parental rights be terminated. He concluded that although Garris was "likeable," had "good social skills," and a good idea of what a parent was, because he was confined to a ten-year sentence "it would be difficult for him to be a parent." He also testified that Garris's illicit livelihood, his criminal record, and his failure to take any personal responsibility for the situation were additional factors supporting his recommendation that Mr. Garris's parental rights be terminated.
Mr. Garris testified that he loved C.H. and wanted to remain his father. He readily admitted his past criminal activities and drug addiction. He stated that he was now divorced, but that he had no contact with and did not know where his teenage son was. He also testified that during the time that he and Ms. Hylton were together, he supported her and urged her to get prenatal care when he learned that she was pregnant. He also claimed that he tried to send money to Ms. Hylton while he was in jail and that he has seen C.H. twice. He claimed that he was seeking drug rehabilitation services in prison and was on medication for a chemical imbalance.
C.H. has been in the continuous foster care of the Sapien family since his removal. The Department has visited the Sapien home monthly. It is uncontroverted that C.H. is well cared for, well-nourished, and developing appropriate to his age. The home is clean and well ordered, and C.H. has his own bedroom. He was observed to interact well with the entire foster family. Dr. Park testified that he visited C.H. when he was three months old and found him to be developing normally. Similar observations were made by a CASA volunteer who visited twice, the last only days before the trial. Like other Department witnesses, she stated that C.H. was a "happy baby." She answered, "[a]bsolutely" when asked if the Sapien foster home was an appropriate environment for C.H.
Mrs. Moore testified that she had only restricted visitations with C.H. since his placement in foster care. She also testified that she had sought custody, but was not considered.[1] She testified that C.H. had bonded to Ms. Hylton and that Ms. Hylton had been a caring and devoted mother. She conceded that the emotional bond between her daughter and grandson had been severed, and that at the time of trial, C.H. was emotionally bonded to the foster parents.
Department caseworker Kelly Perea testified that since April 1997, the Department's permanency planning goal for C.H. has been to seek termination of parental rights and place C.H. for adoption. Ms. Perea, and other Department witnesses, explained that permanence was the ultimate goal of the Department and that it could be accomplished by reunification with the parents, adoption, relative placement, or permanent foster care with commitment for teenage children. Ms. Perea *47 explained that decision here was based on C.H.'s age and Ms. Hylton's previous noncompliance with service requirements. She also testified that C.H.'s age was the predominate permanency factor "[b]ecause a child his age is very adoptable."

II.

Standards of Review
Involuntary termination of parental rights is a drastic remedy and is of such weight and gravity that due process requires the State to justify termination by "clear and convincing evidence." In the Interest of G.M., 596 S.W.2d 846, 847 (Tex. 1980). This standard is defined as "that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Id. It is an intermediate standard of proof, falling between the preponderance standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings. State v. Addington, 588 S.W.2d 569, 570 (Tex.), vacated & remanded, Addington v. Texas, 441 U.S. 418, 423, 99 S.Ct. 1804, 1808, 60 L.Ed.2d 323 (1979); In the Interest of B.R., 950 S.W.2d 113, 117 (Tex.App.-El Paso 1997, no writ). Its function is to allocate the risk of error between the litigants and to indicate the relative importance attached to the ultimate decision. See Addington v. Texas, 441 U.S. at 423, 99 S.Ct. at 1808; see also TEX.FAM.CODE ANN. § 101.007 (Vernon 1996); In the Interest of G.M., 596 S.W.2d at 847; In the Interest of B.R., 950 S.W.2d at 117; Smith v. Sims, 801 S.W.2d 247, 250 (Tex.App.-Houston [14th Dist.] 1990, no writ). Termination proceedings should be strictly scrutinized, and involuntary termination statutes are strictly construed in favor of the parent. In the Interest of Shaw, 966 S.W.2d 174, 179 (Tex.App.-El Paso 1998, no pet.).
When reviewing a legal sufficiency challenge, we consider only the evidence and inferences, when viewed in their most favorable light, that tend to support the jury's finding, and disregard all evidence and inferences to the contrary. See Davis v. City of San Antonio, 752 S.W.2d 518, 522 (Tex.1988); Stafford v. Stafford, 726 S.W.2d 14, 16 (Tex.1987); In the Interest of B.R., 950 S.W.2d at 119. If such evidence amounts to more than a mere scintilla, that is more than a basis for mere surmise or suspicion, then the legal sufficiency challenge fails. See Stafford, 726 S.W.2d at 16; Paragon Hotel Corp. v. Ramirez, 783 S.W.2d 654, 657 (Tex.App.-El Paso 1989, writ denied); see also, In the Interest of B.R., 950 S.W.2d at 119. A legal sufficiency challenge does not require a change in the traditional standard of review where the burden of proof is by clear and convincing evidence as it is here. See In the Interest of B.R., 950 S.W.2d at 119; Edwards v. Texas Dep't of Protective and Regulatory Services., 946 S.W.2d 130, 137 (Tex.App.-El Paso 1997, no writ).
In reviewing factual sufficiency challenges in termination cases, again where the burden of proof at trial is by clear and convincing evidence, we apply a higher standard of factual sufficiency review. See In the Interest of G.B.R., 953 S.W.2d 391, 396 (Tex.App.-El Paso 1997, no writ); In the Interest of B.R., 950 S.W.2d at 118-19. After considering all of the evidence, we must determine not whether the trier of fact could reasonably conclude that the existence of a fact is more probable than not, as in cases where the burden of proof is by a preponderance of the evidence, but whether the trier of fact could reasonably conclude that the existence of the fact is highly probable. See In the Interest of G.B.R., 953 S.W.2d at 396; In the Interest of B.R., 950 S.W.2d at 119. Under this standard, we must consider whether the evidence was sufficient to produce in the mind of the trier of fact finder a firm belief or conviction as to the truth of the allegations sought to be established. See In the Interest of G.B.R., 953 S.W.2d at 396; In the Interest of B.R., 950 S.W.2d at 119, both citing *48 Mezick v. State, 920 S.W.2d 427, 430 (Tex. App.-Houston [1st Dist.] 1996, no writ), and In the Interest of P.S. and L.S., 766 S.W.2d 833, 835 (Tex.App.-Houston [1st Dist.] 1989, no writ). A challenge to the factual sufficiency of the evidence will only be sustained if the jury could not have reasonably found the facts to be established by clear and convincing evidence. See In the Interest of G.B.R., 953 S.W.2d at 396; In the Interest of B.R., 950 S.W.2d at 119.

III.

Statutory Basis for Involuntary Termination of Parental Rights
Specific to this case, Section 161.001(1)(D), (E) and (H) of the Family Code provide:
§ 161.001 Involuntary Termination of Parent-Child Relationship
The court may order termination of the parent-child relationship if the court finds by clear and convincing evidence:
(1) that the parent has:
...
(D) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child;
(E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child;
...
(H) voluntarily, and with knowledge of the pregnancy, abandoned the mother of the child beginning at a time during her pregnancy with the child and continuing through the birth, failed to provide adequate support or medical care for the mother during the period of abandonment before the birth of the child, and remained apart from the child or failed to support the child since the birth;
...
(2) that termination is in the best interest of the child.
TEX.FAM.CODE ANN. § 161.001(1)(D)(E)(H) and (2)(Vernon Supp.2000).
Thus, the involuntary termination of the parent-child relationship requires bifurcated findings that:
 an offending behavior under one of the grounds in Section 161.001(1) has occurred; and that
 termination is in the best interest of the child.
See TEX.FAM.CODE ANN. § 161.001. Both findings must be established by clear and convincing evidence. See TEX.FAM.CODE ANN. § 161.001; Holick v. Smith, 685 S.W.2d 18, 20 (Tex.1985); In the Interest of G.M., 596 S.W.2d at 847; In the Interest of B.R., 950 S.W.2d at 117.
Because multiple grounds for termination against both parents were alleged by the Department and the trial court submitted the issue using a broad form question, the jury's findings should be upheld if any of the grounds for termination pleaded by the Department support the jury's findings. See Edwards, 946 S.W.2d at 134-35.

IV

Discussion
We will consider separately Ms. Hylton's and Mr. Garris's challenges and begin our discussion with Ms. Hylton. We will also first review the evidentiary challenges to findings of endangerment and abandonment and then consider the finding that termination is in the best interest of the child. Since both legal and factual sufficiency challenges are raised, we first examine the legal sufficiency. See Glover v. *49 Texas Gen. Indem. Co., 619 S.W.2d 400, 401 (Tex.1981).

Susan Hylton

Endangerment to the child
We first consider Ms. Hylton's challenge of the legal sufficiency of the evidence supporting the jury finding that she knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endangered the physical or emotional well-being of the child and engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangered the physical and emotional well-being of the child.
An assessment of only the evidence that supports the jury's finding yields the firm conclusion that there is ample evidence for a jury to reasonably conclude that Ms. Hylton, through her own conduct, and through the conduct of other adults she allowed into her home, endangered the physical or emotional well-being of C.H. By her own admission, she and others were using crack cocaine in the apartment on the night and morning of C.H.'s removal. The conspicuous presence of drug residue and paraphernalia as revealed in photographs and testimony shows much more than simple usage, it was a binge. The disarray and damage to the apartment evince raging domestic violence. All of this knitted together is proof of a course of reckless or foolish conduct that could clearly endanger a child. "Laying down" with a man, whose real name she did not know, in the bedroom she shared with her infant son is still more evidence that supports the jury's finding. The evidence in the record is sufficient to cross the constitutional threshold and thus legally sufficient to support the jury's findings on both of the endangerment grounds.
We next consider the factual sufficiency challenge to the endangerment findings. Here, we consider all of the evidence to determine whether it is highly probable that the jury could reasonably find that Ms. Hylton knowingly allowed her child to remain in a place which endangered the physical or emotional well-being of the child or engaged in some conduct which endangered the physical or emotional well-being of the child.
The Department's case focused on three distinct categories of acts and omissions. First, the Department produced evidence about Ms. Hylton's history of chronic substance abuse and related illicit activities before C.H.'s birth and the circumstances leading to the relinquishment of her first child. The second focused on the drug-fueled violence and promiscuity of the night of March 9, 1996. Third, the Department sought to emphasize Ms. Hylton's refusal to cooperate with the Department to achieve reunification and her continuous incarceration from the end of March 1997 through and beyond the trial.
It is undisputed that Ms. Hylton has a chronic, maybe profound, drug abuse problem and has had it since her teens. She voluntarily relinquished parental rights to her first child; indeed, it appears that she never had custody of that child. Approximately a year later, her second child, C.H., was removed from her custody when she was nineteen. She admitted to cocaine consumption during the first months of her pregnancy with C.H. There is testimony that to her credit, she sought out a Department caseworker to ask for help getting into a drug treatment program and specifically expressed concern for her unborn child. While not explained, it is clear from the record that Ms. Hylton spent at least the last five months of her pregnancy in the El Paso County jail, presumably drug-free, and received regular prenatal care. It is evident that the baby was carried to a full-term birth on December 14, 1996. As we noted earlier, although there were allegations in the record that the baby was born drug positive and exhibited developmental traits commonly associated with in utero exposure to cocaine, we find no evidence to support those allegations. All the evidence goes the other *50 way, that C.H. does not suffer from in utero exposure to drugs. The record shows that C.H. was born full-term and released from the hospital four days after birth. Every witness called by the Department who had observed C.H. following his removal, from mere days following to mere days before trial, stated that C.H.'s development was normal and appropriate. He was by all accounts a normal, well-developed, and happy baby. There was a statement in the Family Service Plan that C.H. had been diagnosed with sickle cell anemia.
There is evidence that Ms. Hylton had formed an emotional bond with the child and had properly provided for his physical, mental, and emotional well-being up to the weekend of March 8-9, 1997. There is also evidence of his interaction with his grandmother and other relatives during that same time period.
When the police entered Ms. Hylton's apartment in the early morning hours of March 9, 1997, they found C.H. sleeping in a playpen. He was appropriately dressed, and appeared healthy and well-fed. There was no suggestion of any actual physical abuse resulting from the events of that night. The only negative testimony about his physical condition was that when the Department removed him from the apartment, some time after 5 a.m., his diapers were soiled.
We have described in detail the condition of the apartment which clearly depicts the deplorable activities that transpired. Indeed, from that evidence only it is reasonable to conclude that C.H.'s physical and emotional well-being after that night was more a consequence of good fortune then the result of any conscious effort by Ms. Hylton. The flagrant use of drugs, the brutish domestic violence, and the promiscuous conduct of Ms. Hylton and her companions are all naturally hostile to C.H.'s physical and emotional well-being. We disagree with the Appellants that expert testimony was needed, in this case, to establish a causal connection between the events and the endangerment of C.H.'s physical and emotional well-being. See Texas Dep't of Human Services v. Boyd, 727 S.W.2d 531, 533 (Tex.1987); In the Interest of B.R., 950 S.W.2d at 119 (proof of endangerment does not require actual injury, rather "it is sufficient that the child's well-being be jeopardized or exposed to loss or injury" and such jeopardy or exposure may be inferred from the parent's misconduct).
The Department's case next shifts to Ms. Hylton's actions after her son's removal and, in particular, her apparent refusal to take those steps required by the Department for her to regain custody. The Department rightly tried to show that her seeming indifference following her son's removal was a direct reflection and continuum of her past course of conduct. Several of the Department's witnesses testified critically that Ms. Hylton did not immediately contact the Department, that she refused to participate in a required psycho-social evaluation and urinanalysis.
There is, however, some evidence contrary to the judgment in this area. For example, in response to a leading question from the Department, Ms. Hylton testified that she was released from jail on March 10, 1997, and she repeated that date at least once more in her testimony. We note the testimony of Mr. Abogado, that strongly suggests that she was still in jail as late as March 11, 1997. This is of some import because Ms. DeLuna's testimony about her visit to Ms. Hylton's apartment on March 11 critically implied that Ms. Hylton was ignoring the situation.
In a similar vein, there was repeated testimony critical of her refusal to submit to a psycho-social evaluation by the Department's clinical psychologist. On close review, the criticism has merit but it is not as weighty as it first appears. Dr. Park testified that on March 14, 1997, it was Ms. Hylton who called to reschedule the evaluation. There is no evidence of why she could not go that day, but calling and *51 rescheduling weighs slightly to her credit. Of course, she did fail to show up for the rescheduled appointment and again she provided no explanation or excuse for missing the rescheduled appointment. At the hearings on March 21 and March 27, 1997, the trial court personally ordered Ms. Hylton to submit to the psycho-social evaluation. Ms. Hylton admitted at trial that she did not comply and offered no excuse or explanation. We note that at the second hearing, on March 27, 1997, the trial court specifically noted that Ms. Hylton was being given "one more opportunity" to complete the evaluation. We cannot tell when the appointment was scheduled, but we do know that Ms. Hylton was arrested in New Mexico two or three days later. Of course, being arrested is not a good excuse, but it would certainly be a real excuse for the last no-show.
We pause here to touch upon another aspect of this issue that we find troubling. On March 17, 1997, when Ms. Hylton failed to show up for the first rescheduled appointment, Dr. Park met instead with her mother and, as he testified, "did the psycho-social." Though he never met with Ms. Hylton, it appears from his testimony that he submitted a recommendation that her parental rights be terminated. He testified that since Ms. Hylton refused to comply, he "had no basis for saying that [she] could be an appropriate parent...." We find such opinion testimony highly suspect since it is highly prejudicial, but its only basis is that it might be inferred that Ms. Hylton's mother had given him information about her drug abuse and criminal conduct. There were, however, no objections at trial.
The third category is really two-fold: (1) that Ms. Hylton was continuously incarcerated from late March 1997 until and through the trial; and (2) whether she would ever be cured of her drug addiction. Regarding her arrest in March 1997, Ms. Hylton has consistently maintained that she had no knowledge that there was marijuana in the car. The record, however, is nearly opaque as to whether the charges were settled or still pending at the time of trial. It appears that she was facing federal charges from her description of the offense. All the record reveals to us is that she remained jailed in New Mexico from March 1997 until September 1997, which would tend to suggest that those charges had been settled.
It appears that Ms. Hylton was actually transferred to the SAFP in November 1997 and she testified that she expected to complete SAFP in July or August 1998, followed by a one to three month stay in a halfway house. This testimony is basically undisputed and, in some particulars, even supported by other witnesses, which leads to the conclusion that it would, from the time of trial, be almost another year before Ms. Hylton would be able to seek reunification with C.H. C.H., who had already been in foster care for one year, would then have to spend almost two years in foster care.
While imprisonment alone is not sufficient by itself to support an inference that the parent's conduct has endangered the child, it can be considered as part of a course of conduct. Trevino v. Texas Dept. of Protective and Regulatory Services, 893 S.W.2d 243, 247 (Tex.App.-Austin 1995, no writ). Clearly, in this case, her incarceration could be a factor that the jury could properly consider in reaching their verdict on the endangerment allegations. At the same time, Ms. Hylton must be given some credit for being in an intensive substance abuse rehabilitation program. That, of course, brings us to the second part, the likelihood of her overcoming her addiction. It is clear from the record that the SAFP program is very demanding and very successful. Moreover, according to the record, it provides ongoing supervision even beyond the period of confinement and the transitional residence period.
Of course, the chaotic character of most of her life shadows the challenge before her. She had undertaken a brief drug treatment program at Aliviane shortly before *52 being jailed in the summer of 1996, and she was presumably sober during that time and for the first few months of C.H.'s life. The events of March 9, 1996, show how hard she could relapse.
Considering all of the evidence at hand, we can say easily that the evidence largely preponderates in favor of the jury's finding, but it is a much more difficult call to say that her acts and omissions, singularly or combined, provide clear and convincing evidence that she endangered the physical or emotional well-being of C.H. But it is our final assessment that we are unable to say that the jury's verdict is not wrong as to be manifestly unjust.

Best Interests
The United States Supreme Court, in visiting the question of parental rights, explained:
`The best interests of the child,' a venerable phrase familiar from divorce proceedings, is a proper and feasible criterion for making the decision as to which of two parents will be accorded custody. But it is not traditionally the sole criterionmuch less the sole constitutional criterionfor other, less narrowly channeled judgments involving children, where their interests conflict in varying degrees with the interests of others. Even if it were shown, for example, that a particular couple desirous of adopting a child would best provide for the child's welfare, the child would nonetheless not be removed from the custody of its parents so long as they were providing for the child adequately. Similarly, `the best interests of the child' is not the legal standard that governs parents' or guardians' exercise of their custody: So long as certain minimum requirements of child care are met, the interests of the child may be subordinated to the interests of other children, or indeed even to the interests of the parents or guardians themselves. [Citation omitted & emphasis in original opinion].
Reno v. Flores, 507 U.S. 292, 303-04, 113 S.Ct. 1439, 1448, 123 L.Ed.2d 1(1993). The Court clearly recognized that the nuances and complexity of human situations make the development and application of the axiombest interests of the child incredibly difficult. It is all the more difficult because, unlike other legal standards which rely on the basic assumption that reasonable people applying the standard can come to an agreement, it is not always clear that reasonable people can agree on what is best for a child. Our only hope is to try to follow determinable standards that avoid any more chaos and pain.
In Holley v. Adams, the Texas Supreme Court held that a number of factors may be examined in ascertaining the best interest of a child, including:
 emotional and physical needs of the child now and in the future;
 parental abilities of the parent seeking custody;
 programs available to assist the parent seeking custody;
 the plans for the child by the parent or the agency seeking custody;
 the stability of the home or the proposed placement; and
 any acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one.
Holley v. Adams, 544 S.W.2d 367, 371-72 (Tex.1976).
The holding in Holley recognizes that "best interest" does not require proof of a unique set of factors nor does it limit the universe of such factors. It is also implicit that underlying each factor and, other pertinent, case specific factors, their temporal locus is a matter of importance because, as events in time, they stand in causal relationship with other events. So too, it must be recognized that the issue of best interest of the child is necessarily infused with the statutory offensive behavior. Consequently, there will be cases where the offending behavior is so pernicious *53 that it demands termination of parental rights and the Department will prevail with relative ease, but also those cases where the best interest determination must have a firm basis in facts standing apart from offending behavior. While the bad acts or omissions might reasonably suggest that a child would be better off with a new family, the evidence may still be insufficient to satisfy the clear and convincing standard. The best interest standard does not permit parental termination merely because a child might be better off living elsewhere. Otherwise, the termination statute might be used for a massive reallocation of children to better and more prosperous parents.
Viewed in the light most favorable to the jury's finding on best interests, we have, of course, evidence of Ms. Hylton's past behavior, criminal activities, and chronic substance abuse. At the time of trial, C.H. was about fifteen months old and had been in foster care for more than a year. Case worker Kelly Perea testified that the Department's permanence plan for C.H. was termination and placement adoption because his mother had already shown noncompliance with previous services and because of C.H.'s age. Age was important, Ms. Perea testified, because "infants are very adoptable." The record also reflects that at the time of trial, Ms. Hylton had, at the very least, nearly a year to go before completing the SAFP program and being at liberty to seek reunification. Coupled with her recalcitrance to the Department's reunification efforts with her first child and her meager efforts in this case, we find some evidence that supports the jury's finding the termination of Ms. Hylton's parental rights is in the best interest of C.H. Thus, there is legally sufficient evidence to support the jury's verdict that the termination of Ms. Hylton's parental rights was in the best interest of the child.
When the trier of fact is required to make a finding by clear and convincing evidence, we will sustain a factual sufficiency point of error only if the fact finder could not have reasonably found that the fact was established by clear and convincing evidence. Reviewing all of the evidence in the record under the clear and convincing standard of proof, we conclude that the evidence is not capable of satisfying that level of proof. This conclusion is not without some anxiety; however, it is our obligation to undertake rigorous judicial appraisals of the legally material facts, consistent with appropriate appellate standards, to ensure that the dominating interest of these proceedings, the best interests of this child, is effectively served, without offending the constitutional protections afforded parents and their children. It is inherent in these cases that juries or trial courts may interpret facts differently in a manner favoring termination or not; this trait requires strict judicial review based upon determinable and legally material evidence. We are called upon to make a judicial review of the jury's decision, not a moral evaluation of the parent's fitness or conduct.
The Department determined to seek termination and placement for adoption within days or weeks of C.H.'s removal and perhaps rightly so, given the Department's recent experiences with Ms. Hylton, but we observe that such doctrinaire actions avoid the difficulties of assessing what is in the best interests of a particular child, and they do not serve the best interest of every child and even undermine or trivialize the best interest of the child principles.
Apart from Ms. Hylton's offensive acts and conduct, the evidence relied upon by the Department to establish the onus of best interest of the child was quite perfunctory. First, the child needs permanence and stability. Second, C.H. was an infant ergo he was very adoptable. Third, C.H. was a very happy baby and well cared for by the foster family, he had his own room in a house that was clean and orderly, and he was emotionally bonded with the foster parents.
*54 It is self-evident that it is in a child's best interest to have continuity of care and caretaker, and timely integration into a stable and permanent home. See Hann v. Texas Dep't of Protective and Regulatory Services, 969 S.W.2d 77, 83 (Tex.App.-El Paso 1998, writ denied). In a process in which stability, continuity, and permanence are made paramount, there is a natural risk that subtle and improper prejudices may arise and unfairly weigh the process against parents with fewer material resources. Consequently, though such goals are axiomatic, they are not talismanic, and we must guard against self-fulfilling prophecies. Simply said, it is not enough to simply resort to slogans, there be must determinable facts proven.
There was considerable evidence of the emotional bonding between C.H. and the foster parents. In addition to what we have earlier discussed, Ms. Nina Gray, a CASA volunteer, testified that the Sapien home was impressively clean and orderly and that C.H. had a "beautiful room all to himself." She was asked "[i]s the Sapien foster home an appropriate environment for C.H.?" Her response was "[a]bsolutely."
This evidence of the child's interaction or emotional bonding and the continuity and quality of care then being provided by the foster parents (as compared to his natural mother, Ms. Hylton) is very influential and presents the unmistakable impression that C.H. was going to be adopted by these foster parents if Ms. Hylton's parental rights were terminated. The problem is that the foster parents never testified and it was never stated that the Sapiens intended to adopt C.H. Thus, their silence is a deafening negative that necessarily infers that they were not considering or intending to adopt C.H. Thus, all of the evidence of the emotional bonding, the excellent care, and home that he was being provided by the foster parents carries little weight because those emotional bonds and ties will have to be severed whether C.H. is placed for adoption with strangers to these proceedings or reunified with his mother.
There is no testimony concerning the potential emotional benefits or costs to C.H. by remaining with the foster parents until Ms. Hylton could attempt reunification efforts or there was placement with a qualifying relative, or adoption by another family. There is no testimony about the child's need for continuity of care and caretakers and for timely integration into a stable and permanent home that takes into account the differences in development and the concept of time to children of different ages. There is no evidence to establish that the emotional and physical needs of the child, now and in the future, would be met by the termination of the parent-child relationship.
The record contains allegations that C.H. was affected by drugs taken by his mother during the pregnancy, that he may have developmental and learning problems, and that he has sickle cell anemia. The physical, mental, and emotional health of a child is clearly a fundamental issue relative to the adoptability of any child. Yet there is no evidence of how those issues, if true, would or would not affect C.H.'s adoptability. If there was evidence that C.H. was on his way to becoming the foster parent's child, these issues would probably have little import, but that is not in the record before us.
In sum, the record before us does not contain clear and convincing evidence that termination of the parent-child relationship is in C.H.'s interest. The record does not adequately support the conclusion that it is highly probable that termination of Ms. Hylton's parental rights was in the best interest of C.H. We sustain Ms. Hylton's Point of Error One.

Robert Garris

Abandonment and Endangerment to the Child
The allegations of parental unfitness against Robert Garris were: (1) that he *55 "engaged in conduct and knowingly placed the child with persons who engaged in conduct which endangered the physical or emotional well-being of the child;" and (2) that he "voluntarily and with knowledge of pregnancy, abandoned [Ms. Hylton] beginning at a time during the pregnancy with [C.H.] and continuing through the birth, failed to provide adequate support or medical care for [Ms. Hylton] during the period of abandonment before the birth of [C.H.], and remained apart from [C.H.] or failed to support [C.H.] since the birth." See TEX.FAM.CODE ANN. § 161.001(1)(D) and (H).
First, considering the evidence in the light most favorable to the jury's verdict, the evidence, and Mr. Garris's own admissions, of an extensive criminal history, of drug dealing and drug abuse, particularly when coupled with his present imprisonment, is clearly some evidence upon which the jury could properly base their finding of endangerment. Incarceration of the parent can contribute to a finding that the parent engaged in a course of conduct which endangered the child's physical or emotional well-being. See In the Interest of J.J. and K.J., 911 S.W.2d 437, 440 (Tex. App.-Texarkana 1995, writ denied). If the conduct for which the parent is incarcerated shows voluntary and deliberate actions, it qualifies as conduct endangering the emotional well-being of a child. See In the Interest of Guillory, 618 S.W.2d 948, 950 (Tex.Civ.App.-Houston [1st Dist.] 1981, no writ); cf. Trevino, 893 S.W.2d at 247; In the Interest of D.L.B., 943 S.W.2d 175, 177 (Tex.App.-San Antonio 1997, no writ). In this case, the series of arrests on drug offenses from April 1996 until November 1996, with full knowledge of Ms. Hylton's pregnancy and possible consequences of his course of conduct, implies that Mr. Garris had a conscious disregard and indifference to his parental responsibilities. See Harris v. Herbers, 838 S.W.2d 938, 942-43 (Tex.App.-Houston [1st Dist.] 1992, no writ). We conclude, again only considering the evidence that supports the jury's findings, there is ample evidence for a jury to conclude rationally that Mr. Garris through his own conduct endangered the physical and emotional well-being of C.H.
A factual sufficiency point requires us to examine all of the evidence in determining whether the finding in question is so against the great weight and preponderance of the evidence as to be manifestly unjust. In the Interest of B.R., 950 S.W.2d at 120-21. We find no evidence in the record that controverts or even offers an excuse for Mr. Garris's illicit activities. After considering all the evidence, we find that it was highly probable that the trial court could reasonably conclude that the child was endangered according to Section 161.001(1)(D).
As far as the abandonment finding, Mr. Garris testified that he knew Ms. Hylton was pregnant with his child as early as March 1996. Though he claimed that he encouraged her to get medical care, he admitted that he never provided her any medical care during her pregnancy. He acknowledged that after their arrest in April 1996, that apart from visiting Ms. Hylton at her mother's home once and one jail visit by Ms. Hylton with C.H., he had had no contact with her or the child up to the time of trial. He admitted that because of his incarceration, he has provided no support since C.H.'s birth. This is adequate evidence upon which a rational jury could find that Mr. Garris abandoned Ms. Hylton during her pregnancy, and remained apart and failed to support C.H. in any manner. The evidence is legally sufficient to support the jury findings on abandonment according to Section 161.001(1)(H).
We next consider all of the evidence to determine whether it is highly probable that the jury could reasonably find that Mr. Garris abandoned Ms. Hylton during her pregnancy, and remained apart from and failed to support C.H. thereafter. There is very little in this record that weighs against the jury's findings. *56 As we noted above, Mr. Garris knew in March 1996 that Ms. Hylton was pregnant. Although he testified that he encouraged her to get medical care, and Ms. Hylton testified similarly, it is undisputed that he never provided her with medical care. Instead, and not long after learning she was pregnant, they are arrested together in a motel room and charged with an assortment of drug offenses.
Mr. Garris claimed that after his release from jail in July 1996 and until his arrest in November 1996, he was putting some money aside to help support Ms. Hylton. He testified that he gave the money to a friend named Mr. Martinez who "blew" the money instead of giving it to Ms. Hylton. Since November 1996, because of his continuous incarceration, he has not provided any monetary support to either Ms. Hylton or C.H. He also acknowledged that he had never attempted to have any contact with C.H. because he believed contact was not permitted.
Mr. Garris's actions following their arrest in April 1996, clearly reflects that he abnegated all personal responsibility for Ms. Hylton, thus consigning her fate, and their unborn son's, to chance or other people. The evidence is clear that following his release on probation in July 1996, Mr. Garris was arrested at least twice more on drug charges that ultimately resulted in the ten-year prison sentence that he is currently serving.
It is not within the Court's province to interfere with the jury's resolution of conflicts in the evidence or to pass on the weight or credibility of the witnesses' testimony. See Benoit v. Wilson, 150 Tex. 273, 239 S.W.2d 792, 796 (1951). Where there is conflicting evidence, the jury's verdict on such matters is generally regarded as conclusive. See Montgomery Ward & Co. v. Scharrenbeck, 146 Tex. 153, 204 S.W.2d 508 (1947); Lopez v. Southern Pacific Transp. Co., 847 S.W.2d 330, 336 (Tex.App.-El Paso 1993, no writ). The jury was entitled to find Mr. Garris's claim that he tried to send Ms. Hylton money through a friend while he was in jail to be incredible. His claims that he encouraged Ms. Hylton to seek medical care, when he knew she was pregnant, rings very hollow where the record shows them being arrested in a motel room on drug charges very soon after learning that she was pregnant with his child.
Finally, the only other evidence that we can find in the record that might be construed as contrary to the jury's findings is his self-professed love and desire to remain C.H.'s father. Yet, the fact that he provided no support, financial, emotional, or physical, after April 1996, and provided no support of any kind to C.H. after the child's birth proves only an awful complacency.
We find the record is adequate to support the jury's conclusion that it was highly probably that Mr. Garris abandoned Ms. Hylton during her pregnancy and failed to provide support or medical care for her and that he remained apart from and failed to support C.H. The evidence is factually sufficient to support the jury findings on the statutory ground of abandonment.

Best Interest of the Child
Viewed in the light most favorable to the jury's finding on best interest, we find the evidence was legally sufficient to support the jury's finding that the termination of Robert Garris's parental rights is in the best interest of this child. The evidence of Mr. Garris's extensive criminal history involving drugs and assaults, his present imprisonment for a term of ten years, and his admitted addiction to cocaine is clearly some evidence and Mr. Garris's no evidence challenge must fail. We have noted the evidence of the Department's permanence plan and the adoptability of C.H. above and need not repeat it here. There is clearly legally sufficient evidence to support the jury's verdict that the termination of Mr. Garris's parental rights was in the best interest of the child.
*57 As stated earlier, we will sustain a factual sufficiency point only if the fact finder could not have reasonably found that clear and convincing evidence established the fact to be proven. In Mr. Garris's case, the best interest of the child evidence is almost undistinguishable from that of Ms. Hylton. For example, Mr. Garris at the time of trial was serving a ten-year prison sentence; however, he testified that he expected to have his first parole hearing in July 1998. He also testified that he was attending voluntarily drug rehabilitation classes, and he candidly discussed the sobriety problems he would face in the future.
Mr. Garris was, unlike Ms. Hylton, interviewed by Dr. Parks, who testified that he had recommended the termination of Mr. Garris's parental relationship to C.H. Nevertheless, as discussed earlier, we are simply not persuaded that an hour and thirty minute interview, approximately one year before trial provides any substantial weight to the evidentiary burden borne by the Department. The trial court, too, was troubled by the passage of time between the interview and the trial, and suggested, during Dr. Park's testimony, that Mr. Garris should be re-interviewed.
Mr. Garris's extensive criminal history and present incarceration provides some footing for the jury's findings, namely, the uncertainty of his ability to seek reunification. Yet, the nature of his criminal record, at least what is in the record, establishes little. It does not appear to show that he is an abusive or violent person, nor does it appear that he has psychological problems, apart from his drug addiction, that potentially puts his son at risk. The Department suggests that Mr. Garris's imprisonment conclusively establishes a potential adverse psychological impact on C.H., but there is no evidence as to the significance of impact on an infant as opposed to an older child. There is no evidence, expert, medical, or otherwise, about C.H.'s present and future emotional and physical needs in the time periods relevant to this case.
As we decided in the case of Ms. Hylton, we must conclude that the record before us does not contain clear and convincing evidence that termination of the parent-child relationship is in C.H.'s interest. The record does not adequately support the conclusion that it is highly probable that termination of Mr. Garris's parental rights was in the best interest of C.H. We sustain Mr. Garris's Point of Error One.
Having sustained both of the Appellants' Points of Error One, we reverse the judgment of the trial court and remand for a new trial.
NOTES
[1] While no such issue has been raised here, we note that there is nothing in the record regarding relative placement which presumably suggests that the Department made the prerequisite determination that relative placement was not in the child's best interest nor feasible. See 40 TEX.ADMIN.CODE § 700.1341(1998).