NUMBER 13-99-769-CV

COURT OF APPEALS

THIRTEENTH DISTRICT OF TEXAS

CORPUS CHRISTI

___________________________________________________________________


FIRST VALLEY BANK OF LOS FRESNOS, NORWEST BANK TEXAS, N.A., AND

WELLS FARGO BANK (TEXAS), N.A. , Appellants,


v.


SAM MARTIN , Appellee.

___________________________________________________________________


On appeal from the 107th District Court

of Cameron County, Texas.

__________________________________________________________________


O P I N I O N


Before Chief Justice Valdez and Justices Hinojosa and Rodriguez

Opinion by Justice Rodriguez


First Valley Bank of Los Fresnos, Northwest Bank of Texas, N.A., and Wells Fargo Bank (Texas), N.A., appellants, appeal
from a money judgment in the amount of $18,089,095.00, in favor of Sam Martin based on a jury's findings of malicious
prosecution and fraud. We reverse and render in part, modify in part, and affirm as modified. 

In February of 1992, Martin borrowed approximately $20,000.00 from First Valley Bank of Los Fresnos (the bank) to help
fund his campaign for sheriff of Cameron County. The bank took a security interest in cattle owned by Martin in Loma
Alta, a large area of land between Brownsville and Port Isabel. 

The parties dispute the number of cattle in which the bank held a security interest. A document titled, "Notice of Security
Interest" describes the security interest as "75 Head of Cross-Bred Cattle." The note lists the security as "[a]ll livestock
now owned or hereafter acquired by debtor including but not limited to 75 head of crossbred cattle." Martin testified that at
the time he obtained the loan, he had more than 200 head of cattle. 

The security agreement contained a provision prohibiting Martin from selling or transferring the collateral without
obtaining the written consent of the bank. The provision also required Martin to provide a detailed notice before selling
any farm products constituting a portion of the collateral in the ordinary course of business. 

Martin renewed the note several times between 1992 and 1994. In September of 1994, he combined the loan with a car
loan for the aggregate amount of $31,209.99. The note was secured by an automobile and "All livestock now owned and
hereafter acquired by debtor, wherever located including but not limited to seventy-five (75) head of crossbred cattle." The
security agreement for this loan also provided that Martin could not sell or transfer the collateral without written consent of
the bank. 

Martin continued to renew the note periodically. In 1995, Martin sold fifty-eight head of cattle to Dr. Lynn Anderson. 
Martin testified that Gus Barrera, chairman of the board with the bank, helped him with the sale of the cattle. Martin did
not notify the bank before selling the cattle nor did he obtain its written consent for the sale. Martin testified he was not
aware he needed to notify anyone of the sale and that Barrera was with him at the sale, knew of the loan, and never
questioned him about the sale. Moreover, at the time of the sale, Martin had approximately two hundred twenty head of
cattle, leaving more than enough cattle for what he believed the security interest covered, namely, seventy-five head of
cattle. 

In 1996, Martin left Texas to manage several cattle ranches in New Mexico, Colorado, Florida, and Utah for a corporation. 
Martin's son, Gus Martin, stayed in Texas to take care of the cattle operation. 

The note became due on September 5, 1996, but Martin failed to pay the note or renew the note as he had previously. In
October of 1996, Gus Martin met with Markus Villanueva, Martin's loan officer, at the bank and paid the accrued interest
on the loan pursuant to Martin's directions. Gus Martin testified Villanueva wanted to speak with Martin. Gus Martin
informed Villanueva that his father could not make it, but would be back around the first of the year to renew the note. 

Villanueva told Gus Martin that he was going to accelerate the note. However, Villanueva also told him that when his
father came in to renew the note, the bank would return the interest rate to the level in the note. Martin told his son that he
would return during the Christmas holidays to renew the note, and had his son pay $500 in principal in December before he
returned to Texas.

As the note was in default, the bank transferred the loan to its special assets department. Martin returned to Texas in
December of 1996 and deposited $1,451.41 into his checking account at the bank. When he went to withdraw funds from
this account, he learned that the money had been seized and applied toward the loan. Martin testified that he met with bank
officials, who told him they had foreclosed on the loan. When Martin asked them why they did not attempt to fax him
paperwork to renew the note, they did not want to talk about it. Martin told the bank officials that if they did not put the
money back and renegotiate the loan, they would not hear from him again. 

Martin returned to his job in Colorado. There is some dispute as to whether the bank knew of Martin's location at this time. 
The parties agree Martin's attorney, Donald Gilpin, of Albuquerque, New Mexico, contacted the bank. Shortly thereafter,
Villanueva sent Gilpin a letter outlining the terms for Martin to renew his loan. Gilpin replied, indicating, among other
things, that Martin would mail the bank a payment. Martin did not, however, do so. 

On May 30, 1997, the bank sold twenty of Martin's cattle to Ruben Barrera, Gus Barrera's brother, for $4,000.00. 
Villanueva testified he did not send Martin a letter notifying him of the sale because he could not locate him. 

In June of 1997, Villanueva called Gilpin. Gilpin sent the bank a letter stating he had terminated representation of Martin
and that he had been unsuccessful in contacting him since January of 1997. 

Jimmy Vasquez, an investigator with the Cameron County sheriff's office testified that Villanueva called him in June or
July of 1997 and told him he could not find cattle Martin had put up for collateral. Vasquez testified Villanueva asked him
to make a criminal complaint, and that Villanueva told him Martin did not have the cattle. Vasquez went to the bank where
he took a statement from Villanueva. Vasquez also testified that when he went to the bank, he told Villanueva there had
been some complaints of criminal trespass in the Loma Alta area. 

Vasquez filed an investigative report dated July 3, 1997. According to the report, Vasquez met with Villanueva, who told
him about the loan and stated that Martin had "put up 75 head of cross bred cattle as collateral to cover the loan. This loan
was to be paid with the sale of the cattle or their offspring." The report stated that "[t]he bank attempted to pick up the
cattle for the note that was past due and upon doing so the cattle could not be found to collect on the note." After
completing his investigation, Vasquez turned his report in to the district attorney's office. 

 The bank gave Credit Management Services (CMS) the task of collecting the debt owed by Martin. CMS drafted a
proposed agreement, which Villanueva signed. CMS contacted Gus Martin, who obtained a power of attorney to act on his
father's behalf. Martin told Gus not to sign the proposed agreement, however, and no agreement was reached. 

In January 1998, Martin was indicted for the offense of hindering a secured creditor. The indictment was ultimately
dismissed. Thereafter, Martin brought suit against appellants, alleging they provided false and incomplete information,
which was turned over to the district attorney's office, and led to Martin's indictment. After a trial on the merits, the jury
found appellants maliciously prosecuted Martin and awarded $500,000 in mental anguish damages, $2,000,000 for
damages to reputation, $50,000 for damages to credit reputation, and $360,000 for loss of earning capacity. The jury
further found appellants committed fraud and awarded Martin $40,000 damages for loss of the benefit of the bargain. The
jury also awarded Martin $15,000,000 in exemplary damages.

Appellants filed a motion for new trial, which was ostensibly overruled, (1) and filed a timely notice of appeal. Martin filed
a request for the trial court to make conclusions of law. Appellants responded, arguing that the trial court was unauthorized
to make conclusions of law in a jury trial. The trial court found it had authority to so act and entered conclusions of law. 
This appeal ensued. 

By their first and third issues, appellants contend there is legally insufficient evidence to support the finding of liability for
malicious prosecution. 

We review a legal sufficiency challenge by considering all the evidence in the light most favorable to the prevailing party,
indulging every reasonable inference in that party's favor. Associated Indem. Corp. v. CAT Contracting, Inc, 964 S.W.2d
276, 285-86 (Tex. 1998); Edwards v. Pena, 38 S.W.3d 191, 196 (Tex. App.-Corpus Christi 2001, no pet.); Alvarez v.
Anesthesiology Assocs., 967 S.W.2d 871, 875 (Tex. App.-Corpus Christi 1998, no pet.).

To maintain a cause of action for malicious prosecution, a plaintiff must prove: (1) the commencement of a criminal
prosecution against the plaintiff; (2) initiated or procured by the defendant; (3) which terminated in the plaintiff's favor; (4)
the plaintiff was innocent; (5) there was an absence of probable cause for the proceedings; (6) the defendant acted with
malice; and (7) damages. Richey v. Brookshire Grocery Co., 952 S.W.2d 515, 517 (Tex. 1997);Alvarez, 967 S.W.2d at
875. 

Appellants contend there is no evidence that they initiated or procured the criminal prosecution.

The causation element requires the plaintiff to show the prosecution was initiated or procured by the defendant. 
Browning-Ferris Indus., Inc. v. Lieck, 881 S.W.2d 288, 290-97 (Tex. 1994). "Initiation" of a criminal prosecution occurs
when the defendant is the entity that actually files the charges. Alvarez, 967 S.W.2d at 875. The Texas Supreme Court has
defined "procurement" as follows:

A person procures a criminal prosecution if his actions were enough to cause the prosecution, and but for his actions the
prosecution would not have occurred. . . . Thus, a person cannot procure a criminal prosecution when the decision whether
to prosecute is left to the discretion of another person, a law enforcement official or the grand jury. An exception . . . occurs
when a person provides information which he knows is false to another to cause a criminal prosecution. 

Lieck, 881 S.W.2d at 293 (emphasis added). 

Martin concedes appellants did not initiate the prosecution. He further concedes that the decisions to prosecute and indict
him were in the sole discretion of the district attorney and grand jury, respectively. Thus, evidence that appellants procured
the prosecution by providing information which they knew was false will support Martin's malicious prosecution cause of
action. Id. 

According to Vasquez, Villanueva told him Martin had had two hundred head of cattle at the Loma Alta ranch, and that
Villanueva was worried about seventy-five head of cattle for purposes of collateral. (2) Vasquez testified he was called
because the bank "could not locate any livestock they had put up as collateral." Villanueva told him he was looking for
seventy-five head of cattle, and Martin did not have the cattle. However, Vasquez testified the bank never gave him any
information that was false, they just failed to give him all the information.

If Villanueva believed the security interest to be seventy-five head of cattle, which the jury could have reasonably inferred
from the evidence, (3) including Vasquez's testimony and report, Villanueva's statements that the bank was looking for
seventy-five head of cattle and that it could not locate any of the cattle, which were made when the bank had already sold
twenty head of cattle as collateral, were knowingly false. That is, there is some evidence the bank knew where some of the
collateral was when Villanueva told Vasquez it could not locate any of the cattle. Moreover, if Villanueva believed the
security interest was limited to seventy-five head of cattle, his statement that the bank was looking for seventy-five head
was false considering the bank had already sold twenty head of cattle. Viewing the evidence in a light most favorable to
the verdict, there is more than a scintilla of evidence that Villanueva made knowingly false representations to Vasquez that
Martin did not have the cattle and that the bank could not locate any of the livestock that had been used as collateral. In
fact, the bank had already located at least twenty and sold them to apply funds to the loan. Appellants also urge that there
is no evidence to show they lacked probable cause. In the context of malicious prosecution, probable cause is "the
existence of such facts and circumstances as would excite belief in the mind of a reasonable person, acting on facts within
his knowledge, that the person charged was guilty of the crime for which he was prosecuted." Richey, 952 S.W.2d at 517. 
The probable cause determination asks whether a reasonable person would believe that a crime had been committed given
the facts as the complainant honestly and reasonably believed them to be before the criminal proceedings were instituted. 
Id. at 523 (citations omitted).

Whether probable cause is a question of law or a mixed question of law and fact depends on whether the parties dispute the
underlying facts. Id. When the facts underlying the defendant's decision to prosecute are disputed, the trier of fact must
weigh evidence and resolve conflicts to determine if probable cause exists, as a mixed question of law and fact. Id.;
Villegas v. Griffin Indus., 975 S.W.2d 745, 752 (Tex. App.--Corpus Christi 1998, pet. denied).

We must determine whether there is more than a scintilla of evidence showing that the bank could not have reasonably
believed Martin had committed the crime of hindering a secured creditor. A person commits the offense of hindering a
secured creditor if he signs a security agreement creating a security interest in property and, "with intent to hinder
enforcement of that interest or lien, he destroys, removes, conceals, encumbers, or otherwise harms or reduces the value of
the property." Tex. Pen. Code Ann. § 32.33 (Vernon 1994).

Appellants contend they had probable cause to make a report because it reasonably appeared that Martin committed the
crime of hindering a secured creditor. Under the security agreement, Martin was required to obtain the bank's written
consent to sell or transfer the collateral. According to the bank, its security interest extended to all of Martin's cattle. 
Martin sold fifty-eight cattle without giving notice to the bank or obtaining written consent; consequently, the bank
maintains it had probable cause to make its report.

Martin counters that the bank waived any interest it had in the fifty-eight cattle by authorizing the sale, through its chairman
of the board of directors, Gus Barrera. Martin testified that Barrera was not only present at the sale of the cattle, but
participated in gathering and hauling the cattle to the buyer's pasture. Gus Martin testified that Martin used the money to
renew the note and pay some of the principal. A party holding a secured claim in collateral waives his security interest and
may neither foreclose nor bring an action for conversion if he consents to a transfer of collateral. Conoco, Inc. v. Amarillo
Nat. Bank, 950 S.W.2d 790, 795 (Tex. App.-Amarillo 1997, pet. denied). Thus, if the bank authorized the sale of the cattle,
it waived its security interest in the fifty-eight cattle and could not have reasonably believed Martin committed the offense
of hindering a secured creditor. 

An "agent" is one who is authorized by a person or entity to transact business or manage some affair for that person or
entity. Neeley v. Intercity Mgmt. Corp., 732 S.W.2d 644, 646 (Tex. App.--Corpus Christi 1987, no writ); Jorgensen v.
Stuart Place Water Supply Corp., 676 S.W.2d 191, 194 (Tex. App.--Corpus Christi 1984, no writ). A director of a
corporation is not, as such, an agent of the corporation. SeeRestatement (second) of Agency § 14C (1958). Nonetheless, an
agency relationship may be found from underlying facts or direct and circumstantial evidence showing the relationship of
the parties. Elite Towing, Inc. v. LSI Fin. Group, 985 S.W.2d 635, 643 (Tex. App.--Austin 1999, no pet.); Stanford v.
Dairy Queen Prods., 623 S.W.2d 797, 800-801 (Tex. App.--Austin 1981, writ ref'd n.r.e.). 

Absent actual or apparent authority, an agent may not bind a principal. Suarez v. Jordan, 35 S.W.3d 268, 272-73 (Tex.
App.-Houston [14th Dist.] 2000, no pet.). Both actual and apparent authority are created through conduct of the principal
directed either to the agent (actual authority) or to a third person (apparent authority). Id. at 273. For there to be an agency
relationship, there must be some act constituting an appointment of a person as an agent; it is a consensual relationship. 
Carr v. Hunt, 651 S.W.2d 875, 879 (Tex.App.--Dallas 1983, writ ref'd n.r.e.). Consent may be implied rather than express.
Id. Indeed, "[a]n agency relationship does not depend upon express appointment or assent by the principal; rather, it may
be implied from the conduct of parties under the circumstances." Orozco v. Sander, 824 S.W.2d 555, 556 (Tex. 1992). An
agency may be implied from acquiescence. Wink, 169 S.W.2d at 723; Gunn v. Schaeffer, 567 S.W.2d 30, 32 (Tex. Civ.
App.--El Paso 1978, no writ).

Apparent authority is based upon the doctrine of estoppel, and one seeking to charge the principal through apparent
authority of the agent must establish conduct by the principal which would lead a reasonable prudent person to believe the
agent has the authority he purports to exercise. Biggs v. United States Fire Ins. Co., 611 S.W.2d 624, 629 (Tex. 1981);
Coker v. Cramer Fin. Group, Inc., 992 S.W.2d 586 (Tex. App.--Texarkana 1999, no pet.) Only the conduct of the
principal, leading one to suppose that the agent has the authority he purports to exercise, may charge the principal through
the apparent authority of an agent. Southwest Title Ins. Co. v. Northland Bldg. Corp., 552 S.W.2d 425, 428 (Tex. 1977);
Suarez, 35 S.W.3d at 273.

In this case, there was testimony from Martin that the bank had the board of directors approve major loans and that Barrera
approved Martin's loan. When asked why he believed Barrera knew about his loan, Martin responded that "Barrera
approved the loan, and I'm sure he told Markus Villanueva I had at least 220 head out there or he wouldn't have approved
the loan." Martin further testified:

This is why [Villanueva] never had to go out really and inspect the cattle, because [Barrera] worked with us. We had all
the ranches together, and we all knew more or less how many cattle we all had. And he was, I'm sure, consulted when they.
. . . When the loan is made, it has to go before the board of directors, unless it's a real small loan, and they have to approve
it. 

 We conclude Martin could have reasonably believed, from the bank's conduct, including its ostensible acquiescence to
Barrera's involvement with Martin's loan, that Barrera was authorized by the bank to assist Martin in selling his cattle. 
Accordingly, Martin provided evidence that the bank waived its interest in the fifty-eight head of cattle; thus, there is some
evidence that the bank could not have reasonably believed Martin committed the crime of hindering a secured creditor. 
Appellants' first and third issues are overruled. 

In their second issue, appellants assert the trial court erred by submitting an improper question in the jury charge. 
According to appellants, the trial court's question, which allowed the jury to find liability for malicious prosecution if
appellants failed to make a full and fair disclosure, presented an invalid legal theory to the jury. See Lieck, 881 S.W.2d at
293 (plaintiff may prove procurement by showing defendant provided false information which he knows is false). Appellee
contends appellants waived any error by failing to object to the question as submitted to the jury and that the question was
substantially correct. 

Appellants requested the following question and instruction with respect to procurement:

Do you find that First Valley Bank procured the criminal prosecution of Sam Martin?

You are instructed that a person procures a criminal prosecution if his actions were enough to cause the prosecution and ,
but for his actions, the prosecution would not have occurred. A person does not procure a criminal prosecution when the
decision whether to prosecute is left to the discretion of another, including a law enforcement official or the grand jury,
unless the person provides information which he knows is false. A criminal prosecution may be procured by more than one
person. Browning-Ferris Industries, Inc. v. Lieck, 881 S.W.2d 288 (Tex. 1994).



Refused:________



 Modified as follows:________



The trial court placed a check mark next to "modified as follows", placed brackets around the entire second paragraph, and
signed the document. The charge actually submitted, unlike the one requested by appellants, permitted the jury to find they
procured the prosecution if they failed to fully and fairly provide material information. However, appellants did not object
to the charge on the ground that it allowed the jury to enter a verdict based on an invalid legal theory.

Rule 276 of the Texas Rules of Civil Procedure provides, in part:

When an instruction, question, or definition is requested and the provisions of the law have been complied with and the
trial judge . . . . modifies the same the judge shall endorse thereon "Modified as follows: (stating in what particular the
judge has modified the same) and given, and exception allowed" and sign the name officially. Such . . . modified
instruction, question, or definition, when so endorsed shall constitute a bill of exceptions, and it shall be conclusively
presumed that the party asking the same presented it at the proper time, excepted to its . . . modification, and that all the
requirements of law have been observed, and such procedure shall entitle the party requesting the same to have the action
of the trial judge thereon reviewed without preparing a formal bill of exceptions.



Tex. R. Civ. P. 276. We conclude the trial court's endorsement of the proposed jury question "modified as follows"
constitutes a bill of exception, and we therefore conclusively presume appellants preserved error. See Tex. R. Civ. P. 276. 
The court indicated with brackets the general language it was to modify. Though the court did not include the language
"and given, and exception allowed" in its endorsement, we conclude the trial court's endorsement "modified as follows"
adequately preserved error given the facts of this case. 

We must next determine if the trial court erred in submitting a malicious prosecution question which allowed the jury to
find procurement if the defendant failed to fully and fairly disclose all material information known to him. 

In Browning-Ferris Indus., Inc. v. Lieck, 881 S.W.2d 288, 289 (Tex. 1994), the supreme court considered whether a trial
court erred in submitting an instruction that allowed the jury to find liability for malicious prosecution if the defendant
caused, aided or cooperated in causing the criminal prosecution to be commenced. Id. at 291. The court concluded that
"the jury should be asked, not whether the defendant 'caused' criminal proceedings, but whether he either initiated or
'procured' them. . . ." Id. at 293. The terms initiated and procured, taken from the Restatement (Second) of Torts, do "not
subject a person to liability for merely aiding or cooperating in causing a criminal prosecution." Id. at 292. "Were it
otherwise, persons only incidentally involved in a criminal investigation might find themselves facing allegations in a civil
suit." Id. Accordingly, the supreme court found that the trial court's instruction, which allowed a finding of malicious
prosecution for mere assistance or cooperation, was improper. 

In addition, the supreme court expressly stated that procurement should be defined such that "[a] person does not procure a
criminal prosecution when the decision whether to prosecute is left to the discretion of another, including a law
enforcement official or the grand jury, unless the person provides information which he knows is false." Id.

The supreme court also addressed the issue of whether a trial court erred in refusing to instruct the jury that a defendant
could not be liable for malicious prosecution unless he gave knowingly false information to investigators. Id. at 294. 
Because there are instances in which a defendant can be held liable for making statements to law enforcement officials
which he did not actually know were false, the supreme court upheld the trial court's refusal to so instruct. Id. The
evidence showed a defendant withheld information from law enforcement officials which might have been important in
determining whether to prosecute the plaintiff. Id. at 290. As the court observed, comment g of section 623 of the
Restatement indicates that where the prosecutor does not exercise his own discretion, "the provider of information has
procured a criminal prosecution whether he knew the information to be false or not." Id. Accordingly, the supreme court
held the trial court did not err in refusing to submit an instruction that the defendant could not be liable unless he knew the
statements made were false because the instruction excluded the possibility of liability if the prosecutor did not exercise his
own discretion and the defendant did not know his statements were false. Id. at 294.

On its face, the supreme court's definition of procurement would not appear to authorize a finding of liability based on a
defendant's failure to fully and fairly disclose all material information known to him. However, a closer examination of
section 653 of the Restatement, upon which the supreme court relied throughout Lieck and in crafting its definition of
procurement, reveals that a defendant's failure to disclose material information may satisfy the procurement element of a
malicious prosecution claim. 

As the court noted, comment g of section 653 states that merely giving information or making an accusation of criminal
misconduct does not amount to a procurement of the proceedings initiated by the officer if it is left entirely to his discretion
whether to initiate the proceedings. Id. at 293. Instead, "in order to charge a private person with responsibility for the
initiation of proceedings by a public official, it must . . . appear that his desire to have the proceedings initiated, expressed
by direction, request or pressure of any kind, was the determining factor in the official's decision to commence the
prosecution, or that the information furnished by him upon which the official acted was known to be false." Id. at 294
(citing Restatement (Second) of Torts § 653, cmt. g (1977)). Thus, when the decision whether to prosecute is left to the
discretion of another, "a person may be liable, not only when he gives information he knows is false to a prosecutor, but
also when his conduct is the determining factor in the prosecutor's decision to prosecute." Lieck, 881 S.W.2d at 294. 

Considering Lieck and section 653 of the Restatement, we are not convinced that procurement, when the decision whether
to prosecute is left to the discretion of another, can only occur if the person provides information which he knows is false. 
When a defendant provides information to a prosecutor regarding criminal misconduct, but fails to fully and fairly disclose
all material information, and his failure to disclose such information ultimately leads the prosecutor to initiate the
prosecution, his conduct can be said to have been the determining factor in the prosecutor's decision to prosecute. Such
conduct would satisfy the Restatement's requirements for procurement. 

Recognition of liability for a defendant's failure to fully and fairly disclose all material information pertinent to criminal
misconduct is not inconsistent with general tort principles, which allow for liability for nonfeasance under some
circumstances. Generally, liability for "nonfeasance" requires "some definite relation between the parties, of such a
character that social policy justifies the imposition of a duty to act." W. Page Keeton Et Al, Prosser & Keeton On the Law
of Torts § 56, at 374 (5th ed.1984). For example, a carrier may be required to aid a passenger in peril, and an innkeeper to
aid his guest. Id. at 376. Moreover, if the defendant's own acts, whether tortious or innocent, are responsible for the
plaintiff's situation, "a relation has arisen which imposes a duty to make a reasonable effort to give assistance, and avoid
any further harm." Id. at 377. Section 321 of the Restatement (Second) of Torts recognizes a duty to act when prior
conduct is found to be dangerous. That section provides, in part, "(i)f the actor does an act, and subsequently realizes or
should realize that it has created an unreasonable risk of causing physical harm to another, he is under a duty to exercise
reasonable care to prevent the risk from taking effect." Restatement (Second) of Torts § 321 (1965).

Furthermore, in the context of a fraud action, Texas courts recognize a duty to speak under some circumstances. See e.g.,
Hoggett v. Brown, 971 S.W.2d 472, 487-88 (Tex. App.-Houston [14th Dist.] 1997, no writ); State Nat'l Bank v. Farah Mfg.
Co., 678 S.W.2d 661, 681 (Tex. App.--El Paso 1984, writ dism'd by agr.). For example, when one makes a partial
disclosure and conveys a false impression, he has a duty to reveal the whole truth. See Ralston Purina Co. v. McKendrick,
850 S.W.2d 629, 636 (Tex. App.--San Antonio 1993, writ denied); Intl. Sec. Life Ins. Co. v. Finck, 475 S.W.2d 363, 370
(Tex. Civ. App.--Amarillo 1971), rev'd on other grounds, 496 S.W.2d 544 (Tex. 1973). 

Similarly, a defendant who takes the affirmative act of providing information to a law enforcement official regarding a third
party's criminal misconduct, and knows of material information, which would likely affect the prosecutor's determination as
to whether to prosecute, should have a duty to disclose all such information. 

The trial court's submission of the malicious prosecution question, which defined procurement to include failure to disclose
material information, was not erroneous. (4) Appellants' second issue is overruled. 

In issues six through nine, appellants challenge the legal and factual sufficiency of the evidence for the jury's award of
damages based on the finding of malicious prosecution. Appellants challenge the sufficiency of the evidence to support the
findings of mental anguish damages, loss of reputation damages, loss of credit reputation damages, and loss of earning
capacity damages. 

By issue six, appellants challenge the mental anguish damages on the bases that there is legally and factually insufficient
evidence of compensable mental anguish and legally and factually insufficient evidence to uphold the amount of the award,
$500,000. To support an award of mental anguish damages, a plaintiff must either present "direct evidence of the nature,
duration, and severity of their mental anguish, thus establishing a substantial disruption in the plaintiff's daily routine," or
"evidence of 'a high degree of mental pain and distress' that is 'more than mere worry, anxiety, vexation, embarrassment, or
anger.'" Latham v. Castillo, 972 S.W.2d 66, 70 (Tex. 1998) (citing Parkway Co. v. Woodruff, 901 S.W.2d 434, 444 (Tex.
1995)). There must also be evidence that the amount of mental anguish damages awarded is fair and reasonable, and the
appellate court must perform a "meaningful evidentiary review" of the amount found. Saenz v. Fidelity Guar. Ins.
Underwriters, 925 S.W.2d 607, 614 (Tex. 1996). Intentional or malicious conduct may be a significant factor in
determining whether mental anguish damages are proper. See City of Tyler v. Likes, 962 S.W.2d 489, 495-96 (Tex. 1997). 

Martin testified after he was indicted, his friends, who knew he had been in law enforcement for years, made jokes about
the sheriff finally getting caught. He tried to laugh, but it hurt and made him feel bad. He realized when he was charged
with hindering a secured creditor that he could have gone to prison for fifteen to twenty years. During a period of eight
months when he was under indictment he did not sleep very well and had no peace; he had never had such a difficult time
sleeping before. On the inside he felt, "[n]ot real good." When asked if he would need help with it, Martin testified, "I'll
deal with it." His arrest and indictment were covered on television and in the newspapers, and he felt everybody knew. He
felt a stigma of being a felon when he dealt with people, and he always carries that inside him. He felt bad because the
arrest, indictment, and news coverage traumatized his family and ruined his son's reputation. He was ashamed. Martin felt
bad because he would probably never be able to work in law enforcement again because of the indictment. He also let his
real estate license lapse and did not apply for a handgun license because he would have to reveal the indictment. 

In Parkway v. Woodruff, 901 S.W.2d 434, 445 (Tex. 1995), the supreme court held that a plaintiff who testified she was
"hot" and that the flooding of her house was "upsetting" and "not pleasant" failed to show compensable mental anguish. 
Her statements revealed mere emotions, such as anger, frustration, or vexation. Id. In this case, by contrast, Martin felt
hurt and ashamed. He felt everyone knew of his arrest and indictment and felt the stigma of being considered a felon. He
had difficulty sleeping for eight months. 

In Gunn Infiniti Inc., v. O'Byrne, 996 S.W.2d 854, 860-61 (Tex. 1999), the supreme court held that grief, disappointment,
public humiliation, and embarrassment over problems with an automobile did not rise to the level of compensable mental
anguish. There, the plaintiff made conclusory statements of his emotional state and many of his feelings were unrelated to
his cause of action against the automobile dealership. Id. In the present case, Martin explained the source of his anguish--
shame over having been arrested and indicted in the public eye and carrying the stigma of being an alleged felon for
months. He explained he felt bad for the trauma to his family and for the damage to his son's reputation. He explained that
during the time he was under indictment he had difficulty sleeping. 

We conclude there is legally and factually sufficient direct evidence of the nature, duration, and severity of Martin's mental
anguish, thus establishing a substantial disruption in his daily routine. Latham, 972 S.W.2d at 70. 

Appellants note that Martin never testified he needed to seek counseling or medication as a result of his emotions, and that
he failed to present any expert medical testimony. However, appellants fail to direct this Court to any authority that expert
testimony must support an award of mental anguish, and we are unable to find any. We next consider whether the amount
of damages awarded was fair and reasonable. Saenz, 925 S.W.2d at 614. Damages for mental anguish are considered
uniquely within the province of the fact finder because of the subjective nature of such injuries and the nature of the related
testimony and evidence. Wal-Mart Stores, Inc. v. Itz, 21 S.W.3d 456, 480 (Tex. App.--Austin 2000, no pet.);Southwestern
Bell Tel. Co. v. Wilson, 768 S.W.2d 755, 763 (Tex. App.--Corpus Christi 1988, writ denied). Here, Martin suffered public
humiliation, shame for himself and family, and spent months with difficulty sleeping. He knew he could spend a long time
in prison if convicted. We conclude that the jury's award of $500,000 for mental anguish is fair and reasonable and not so
contrary to the overwhelming weight of the evidence as to be clearly wrong or unjust. Appellants' sixth issue is overruled.

In issue seven, appellants contest the award of loss of reputation damages, arguing there is legally and factually insufficient
evidence that Martin's reputation was damaged or that the amount awarded, $2,000,000, was fair and reasonable. Martin
was a former law enforcement officer, a father, and had run for sheriff of Cameron County. He testified he lost a lot of
respect in Cameron County. Martin testified his name is very important to him. He feels that he carries the stigma of
having been indicted for a felony, and that everybody is aware of the indictment. His case was covered by the local media.
Whenever he fills out an application that asks if he has ever been arrested and charged with a felony, he must answer
affirmatively. He testified he will probably never be able to work in law enforcement again due to his indictment. We find
there is legally and factually sufficient evidence to support the award of loss of reputation damages and that the award of
$2,000,000 is fair and reasonable considering Martin's relation with the community and the stigma associated with having a
felony indictment on his record. Appellants' seventh issue is overruled.

Appellants, in their eighth issue, challenge the loss of credit reputation damages on the grounds that there is no evidence
that he ever applied for a loan. The supreme court has held that for loss of credit reputation, "a plaintiff does not suffer
actual damage merely from the inability to obtain a loan. There must be a showing that such inability resulted in injury and
proof of the amount of that injury." St. Paul Surplus Lines v. Dal-Worth Tank Co., 974 S.W.2d 51, 53 (Tex. 1998). In
Dal-Worth, the plaintiff presented evidence of his credit before and after he filed bankruptcy, but there was no evidence
that the plaintiff ever needed to use the credit or ever tried to do so. Id. 

In this case, Martin testified his credit was excellent with the bank prior to the indictment. He had obtained and paid off
several loans in the amounts of $20,000 or $30,000. He could walk into any bank in Texas and get a $20,000 loan. He
testified his credit was ruined after the indictment. He lost his credit cards and testified he will not be able to get a loan for
a long time. A few days before his indictment was dismissed, Martin went to the bank to attempt to renegotiate the terms
of the loan. They did not want to make a new loan. He wanted some paperwork or a contract, but they refused and told
him to pay as he could. Martin failed to provide testimony as to the amount of the injury, or the amount for which he
sought to obtain a new loan or to renew the existing loan. The jury, in response to question eight, answered that $50,000
would pay all sums owed to appellants by Martin. Correspondingly, the jury awarded Martin $50,000 for loss of credit
reputation. We are unable to find any evidence supporting this amount. Accordingly, there is legally insufficient evidence
to support the award for loss of credit reputation. Appellants' eighth issue is sustained. By their ninth issue, appellants
attack the loss of earning capacity damages on the basis that a plaintiff can only recover such damages if he suffered a
physical impairment or injury that impaired his ability to earn a living. Appellants direct us to Metro. Life Ins. Co. v.
Haney, 987 S.W.2d 236, 244-45 (Tex. App.-Houston [14th Dist.] 1999, pet. denied), in which our sister court reversed an
award of damages for loss of earning capacity because the plaintiff did not present sufficient evidence to prove diminished
earning power as a result of physical impairment. The court stated, "[a] survey of Texas cases addressing claims for loss of
earning capacity reveals that a plaintiff may recover where he has shown a physical impairment affecting his ability to earn
a living." Id. at 245 (citations omitted). 

 The cases cited by Haney all involve negligence personal injury claims, and none purport to hold that damages for lost
earning capacity may not be recovered for torts not involving personal injuries. SeeHanna v. Lott, 888 S.W.2d 132, 139
(Tex. App.-Tyler 1994, no writ) (no recovery for loss of earning capacity in negligence action where damage to car caused
lost earnings because of the "loss of use" rule);Border Apparel-East, Inc. v. Guardian, 868 S.W.2d 894, 898 (Tex. App.-El
Paso 1993, no writ) (no recovery for lost earnings in a negligence case because insufficient evidence of future wage
expectancies);Tri-State Motor Transit Co. v. Nicar, 765 S.W.2d 486, 492 (Tex. App.-Houston [14th Dist.] 1989, no writ)
(upholding an award of lost earning capacity in a personal injury case); Ceiling Fan Warehouse, Inc. No. 3 v. Morgan, 723
S.W.2d 195, 199 (Tex. App.-Houston [1st Dist.] 1986), aff'd as modified, 725 S.W.2d 715 (Tex. 1987) (award of lost
earning capacity damages in negligence case reversed because no evidence that injury was associated with inability to
work); Goldston Corp. v. Hernandez, 714 S.W.2d 350, 352 (Tex. App.-Corpus Christi 1986, writ ref'd n.r.e) (upholding
lost earning capacity damages in a personal injury case). We decline to hold that a plaintiff who does not suffer personal
injury may not recover for loss of earning capacity. See Peshak v. Greer, 13 S.W.3d 421, (Tex. App.-Corpus Christi 2000,
no pet.) (finding sufficient evidence to uphold damages for lost earning capacity in a libel suit);Borden, Inc. v. Guerra, 860
S.W.2d 515, 524-25 (Tex. App.-Corpus Christi 1993, writ dism'd by agr.) (upholding an award of future lost wages and
employment benefits). Thus, a plaintiff may recover for loss of earning capacity if he has shown an injury affecting his
ability to earn a living. Certainly, as may be the case with physical impairments, acts such as malicious prosecution and
libel may have a devastating effect on an individual's ability to earn a living. 

We must still determine whether Martin produced legally and factually sufficient evidence that his injury affected his
ability to earn a living. Loss of earning capacity is always uncertain and generally left to the discretion of the fact finder. 
Borden, 860 S.W.2d at 524. At the same time, the injured party is required to introduce sufficient evidence to allow the
jury to reasonably measure earning capacity prior to the injury. Wal-Mart Stores, Inc. v. Cordova, 856 S.W.2d 768, 770
(Tex. App.--El Paso 1993, writ denied);City of Houston v. Howard, 786 S.W.2d 391, 395-96 (Tex. App.--Houston [14th
Dist.] 1990, writ denied).

In the present case, Martin testified he quit his job in Colorado because of the indictment. He earned $2,000 a month in
that job, and was given a place to reside, a truck, and all of his expenses were paid. He testified this job would be available
when he returned if his employers did not hire someone else. Martin testified that he did not believe he could get a job in
law enforcement due to the indictment. He made approximately $40,000 a year while he was in law enforcement. Martin
was fifty-six years of age at the time of trial. The jury awarded Martin $360,000 for lost earning capacity. We conclude he
produced legally and factually sufficient evidence to support this award. Appellants' ninth issue is overruled. 

By their fourth, fifth, and tenth issues, appellants contend there is legally and factually insufficient evidence to support the
jury's finding of fraud. Appellants first maintain there was no evidence or factually insufficient evidence that Villanueva
made a false statement or promise without an intention of performing. Appellants further assert there is no evidence or
factually insufficient evidence that Martin was damaged from any representations. 

The elements of fraud are: (1) a material misrepresentation was made; (2) it was false; (3) when the representation was
made, the speaker knew it was false or the statement was recklessly asserted without any knowledge of its truth; (4) the
speaker made the false representation with the intent that it be acted on by the other party; (5) the other party acted in
reliance on the misrepresentation; and (6) the party suffered injury as a result. DeSantis v. Wackenhut Corp., 793 S.W.2d
670, 688 (Tex. 1990). A promise of future performance constitutes an actionable misrepresentation if the promise was
made with no intention of performing at the time it was made. Formosa Plastics Corp. USA v. Presidio Engrs. and
Contractors, Inc., 960 S.W.2d 41, 48 (Tex. 1998).

As evidence of a false representation, Martin directs this Court to representations made by Villanueva to Gus Martin when
he went to the bank to make an interest payment for his father in October of 1996. Gus Martin testified that he informed
Villanueva that his father would return around the first of the year to renew the note. In response, Villanueva told him he
was going to accelerate the note. However, Gus Martin was told that when his father came in to renew the note at the first
of the year, the interest rate would be retroactive upon renewal. 

Gus Martin relayed to his father what Villanueva had told him regarding the note. Martin returned during the Christmas
holidays to renew the note and visit his family. He deposited $1,451.41 in his checking account at the bank. According to
Martin, he was going to use this money to renegotiate the loan. When he later went to withdraw funds from the account, he
learned that the money had been seized. Martin then spoke with Villanueva, who told him that his note had been
accelerated and that they were going to foreclose. Villanueva said the money was taken out of the account to pay interest
on the loan. Martin told him, "if you do not put this money back into my checking account and renegotiate this loan, I'm
going to leave the bank. . . ." Martin then left and returned to Colorado.

In his brief, Martin contends that Villanueva's statement that he could renew the note when he returned was false and that
he had no intention of performing when he made the representation. We are unable, however, to find any evidence that
Villanueva's representation that Martin could renew the note when he returned was false because there is no evidence the
bank refused to renew the note. Martin's statement that he was going to leave the bank if Villanueva did not return the
money to his checking account and renegotiate the loan does not necessarily lead to the inference that the bank refused to
renew the loan. In fact, it is equally plausible that Villanueva said nothing to Martin and Martin left the bank, or that
Villanueva told Martin he would renew the note but not return the money to his checking account. "When circumstances
are consistent with either of the two facts and nothing shows that one is more probable than the other, neither fact can be
inferred." Litton Indus. Prods., Inc. v. Gammage, 668 S.W.2d 319, 324 (Tex. 1984). Because there is no evidence the
bank refused to renew the loan, there is legally insufficient evidence to support the jury's finding that appellants committed
fraud. Appellants' fourth, fifth, and tenth issues are sustained.

In their eleventh issue, appellants contest the legal and factual sufficiency of the evidence that they acted with malice, a
prerequisite for the award of exemplary damages, which in this case was $15,000,000. (5) To establish malice as a basis for
an award of exemplary damages, Martin must have proven by clear and convincing evidence:



(A) a specific intent by the defendant to cause substantial injury to the claimant; or



(B) an act or omission:



(i) which when viewed objectively from the standpoint of the actor at the time of the occurrence involves an extreme
degree of risk, considering the probability and magnitude of the potential harm to others; and



(ii) of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious
indifference to the rights, safety, or welfare of others.

Tex. Civ. Prac. & Rem. Code Ann. § 41.001(7) (Vernon 1997).

When reviewing a fact finding made by clear and convincing evidence, we must determine, after considering all of the
evidence, whether the trier of fact could reasonably conclude that the existence of the fact is highly probable. In re G.B.R.,
953 S.W.2d 391, 396 (Tex. App.-El Paso, 1997, no writ);Ybarra v. Tex. Dept. of Human Servs., 869 S.W.2d 574, 579-80
(Tex. App.-Corpus Christi 1993, no writ). We will sustain a challenge to the sufficiency of the evidence under this
standard "if the fact finder could not have reasonably found that the fact was established by clear and convincing evidence." 
Ybarra, 869 S.W.2d at 580; W. Wendell Hall, Standards of Review, 29 St. Mary's L.J. 351, 502-03 (1998). Thus, we will
reverse the award of exemplary damages if the jury could not have reasonably concluded that it was highly probable that
appellants acted with malice. 

We have already concluded there is some evidence that the bank provided knowingly false information to Vasquez by
telling him that they were looking for seventy-five head of cattle, and that they were unable to locate Martin's cattle. We
further conclude the jury could have reasonably found that appellants acted with malice by clear and convincing evidence. 
Providing information which is likely to lead to the criminal prosecution of an individual, when one knows the information
to be false, involves an extreme risk of harm to that individual. Appellants' eleventh issue is overruled. 

By their twelfth issue, appellants contend the trial court erred in failing to apply a statutory cap to the exemplary damages
awarded by the jury. Tex. Civ. Prac. & Rem. Code Ann. § 41.008 (Vernon 1997).

Martin asserts that the cap is inapplicable because the award falls under the Texas Debt Collection Act, and at the time
Martin's cause of action accrued, chapter 41 of the civil practice and remedies code did not apply to actions under the Act. 
See Act of May 19, 1973, 63rd Leg., R.S., ch. 547, § 2, 1973 Tex. Gen. Laws 1513. Appellants respond that Martin did
not submit a question to the jury for liability under the Texas Debt Collection Act (the Act). Accordingly, appellants
maintain Martin waived any such question; and because there was no claim under the Act, the cap is applicable. 

The plaintiff has the "burden to obtain affirmative answers to jury questions as to the necessary elements of his cause of
action." Ramos v. Frito-Lay, Inc., 784 S.W.2d 667, 668 (Tex. 1990). The failure to submit a question to a jury on a theory
of liability waives any such claim. See Southwestern Bell Tel. Co. v. Delanney, 809 S.W.2d 493, 495 (Tex. 1991). 

Martin contends that by finding appellants liable for fraud and malicious prosecution, the jury made the necessary findings
to support a claim under the Act. We disagree. The Act, which has been codified in the finance code, provided that "[n]o
debt collector may collect or attempt to collect any debt alleged to be due and owing by any threats, coercion, or attempts to
coerce which employ any of the following practices: * * * * (b) accusing falsely or threatening to accuse falsely any person
of fraud or any other crime." Act of May 19, 1973, 63rd Leg., R.S., ch. 547, § 2, 1973 Tex. Gen. Laws 1513. In this case,
no question was presented to the jury as to whether appellants collected or attempted to collect any debt by threat, coercion,
or attempts to coerce. (6) Because the jury was not presented with a theory of liability under the Act, Martin has waived the
claim and cannot claim now that this case is governed by the Act. Accordingly, the Act does not preclude application of the
exemplary damages cap found in section 41.008 of the civil practice and remedies code. We conclude the trial court erred
in failing to apply section 41.008 of the civil practice and remedies code to the award of exemplary damages. 

Section 41.008 of the Texas Civil Practice and Remedies Code limits exemplary damages to the greater of $200,000 or two
times the amount of economic damages plus noneconomic damages not to exceed $750,000. Tex. Civ. Prac. & Rem. Code
Ann. § 41.008 (Vernon 1997). In the present case, after eliminating the fraud damages and loss of credit reputation
damages which we have reversed based on legally insufficient evidence, we are left with $500,000 in mental anguish
damages, $2,000,000 for damages to reputation, and $360,000 for loss of earning capacity. The award of $360,000 for loss
of earning capacity is an economic damage; that is, it is a compensatory damage for pecuniary loss. SeeTex. Civ. Prac. &
Rem. Code Ann. § 41.008 (Vernon 1997). Thus, two times the economic damages in this case is $720,000. The amount of
noneconomic damages is $2,500,000. Section 41.008 permits an award of two times economic damages plus an amount
equal to any noneconomic damages, not to exceed $750,000. Therefore, Martin was entitled to no more than $720,000 plus
$750,000, or $1,470,000 in exemplary damages. Appellants' twelfth issue is sustained and the award of exemplary
damages is reduced accordingly. 

With respect to Martin's claim of fraud, the judgment of the trial court is REVERSED and RENDERED that Martin take
nothing. Likewise, the award of damages in favor of Martin for loss of credit reputation is REVERSED and RENDERED
that Martin take nothing. The award of exemplary damages is MODIFIED to reflect an award of $1,470,000. In all other
respects, the judgment is AFFIRMED. 



NELDA V. RODRIGUEZ

Justice



Publish .

Tex. R. App. P. 47.3.



Opinion delivered and filed

this 9th day of August, 2001.

1. There is no order overruling the motion for new trial. At the end of the hearing on the motion for new trial, the trial
judge informed the parties that he would take the matter under advisement and inform them of his decision. In any case,
the motion for new trial was overruled by operation of law. See Tex. R. Civ. P. 329b; Cecil v. Smith, 804 S.W.2d 509, 511
(Tex. 1991) ("[i]f an original or amended motion for new trial is not determined by written order signed within 75 days
after the judgment was signed, it is overruled by operation of law"). 

2. Appellants assert the parol evidence rule precludes this Court from considering extraneous documents and
communications between Martin and the bank indicating that the collateral was seventy-five, rather than all of his cattle. 
However, in reviewing the sufficiency of the evidence of the jury's malicious prosecution finding, we are not limited to
considering the terms of the note. Instead, we are concerned with the representations made to the law enforcement official,
and whether those representations were knowingly false. See Browning-Ferris Indus., Inc. v. Lieck, 881 S.W.2d 288, 293
(Tex. 1994). 

3. Appellants dispute this inference because the notes unambiguously provided that the bank held a security interest in all
of Martin's livestock, and the bank could have been looking for seventy-five head of cattle to cover the balance on the note,
despite its recent sale of twenty cattle. In a no-evidence review, however, we make all inferences in favor of the verdict,
disregarding all inferences to the contrary. Associated Indem. Corp. v. CAT Contracting, Inc, 964 S.W.2d 276, 285-86
(Tex. 1998).

4. Appellee directs this Court to Richey v. Brookshire Grocery Co., 952 S.W.2d 515, 519 (Tex. 1997), for the proposition
that the failure to fully disclose all material information can support the causation element of a malicious prosecution case. 
We do not read Richey, however, as expressly allowing the failure to disclose all relevant facts to suffice for causation in a
malicious prosecution action. 

In Richey, the supreme court concluded that the defendant's failure to fully and fairly disclose all relevant facts to police
was not relevant to the probable cause element. Id. The court addressed the malice and causation elements in dictum,
stating, "failing to fully and fairly disclose all material information and knowingly providing false information to the
prosecutor are relevant to the malice and causation elements of a malicious prosecution claim but have no bearing on
probable cause." Id. The court further explained that "the extent of the disclosure to the prosecutor is not probative of lack
of probable cause, but rather indicates whether the complainant may have acted with malice or may have, by knowingly
providing false information, caused the prosecution." Id.; see also Lonon v. Fiesta Mart, Inc., 999 S.W.2d 458, 461 (Tex.
App.--Houston [14th Dist.] 1999, no pet.). A close reading of Richey indicates that failing to disclose material information
is relevant to malice, while knowingly providing false information is relevant to causation. See Richey, 952 S.W.2d at 519
(citing Sebastian v. Cheney, 24 S.W. 970 (Tex. Civ. App.),rev'd, 86 Tex. 497, 25 S.W.691 (1894); Lieck, 881 S.W.2d at
293-94) (citing Sebastian for the proposition that failing to make full disclosure is probative of malice, while citing Lieck
for the proposition that knowingly making false disclosure is probative of causation)). 

5. We note that appellants do not contend in issue eleven that the award of exemplary damages was excessive. 

6. We note that the court, in its conclusions of law, concluded that Martin committed various violations of the Act. It is
generally improper for a trial court to make findings of fact and conclusions of law following a jury trial. See Tex.R. Civ.
P. 296; John G. and Stella Kenedy Mem. Found. v. Dewhurst, 994 S.W.2d 285, 308 (Tex. App.-Austin 1999, no pet);
Rathmell v. Morrison, 732 S.W.2d 6, 16 (Tex. App.--Houston [14th Dist.] 1987, no writ). Here, the jury made no findings
with respect to the Act and the court did not act as the fact-finder in this case. Whether appellants committed a violation of
the Act in this case was a question of fact, and thus, properly left to the jury.